In re CITIGROUP INC. SHAREHOLD-
ER DERIVATIVE LITIGATION.

Civil Action No. 3338–CC.

Court of Chancery of Delaware.

Submitted: Jan. 28, 2009.
Decided: Feb. 24, 2009.

Pamela S. Tikellis, Meghan A. Adams, and Tiffany J. Cramer, of Chimicles & Tikellis LLP, Wilmington, Delaware; Of Counsel: Marvin A. Miller, of Miller Law LLC, Chicago, Illinois; Daniel W. Krasner, Peter C. Harrar, and Matthew M. Guiney, of Wolf Haldenstein Adler Freeman & Herz LLP, New York, New York, Attorneys for Plaintiffs.

Gregory P. Williams and John D. Hendershot, of Richards, Layton & Finger, P.A., Wilmington, Delaware, Attorneys for Defendants and Nominal Defendant Citigroup Inc.

Brad S. Karp, Richard A. Rosen, and Susanna M. Buergel, of Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, Attorneys for Defendants Charles Prince, Winfried Bischoff, Robert E. Rubin, David C. Bushnell, John C. Gerspach, Lewis B. Kaden, Sallie L. Krawcheck, and Gary Crittenden.

Robert D. Joffe and Richard W. Clary, of Cravath, Swaine & Moore LLP, New York, New York, Attorneys for Defendants C. Michael Armstrong, Alain J.P. Belda, George David, Kenneth T. Derr, John M. Deutch, Roberto Hernández Ramirez, Andrew N. Liveris, Anne M. Mulcahy, Richard D. Parsons, Judith Rodin, Robert L. Ryan, Franklin A. Thomas, Ann Dibble Jordan, Klaus Kleinfeld, and Dudley C. Mecum.

Lawrence B. Pedowitz, George T. Conway III, Jonathan M. Moses, and John F. Lynch, of Wachtell, Lipton, Rosen & Katz, New York, New York, Attorneys for Nominal Defendant Citigroup Inc.

## *OPINION*

CHANDLER, Chancellor.

This is a shareholder derivative action brought on behalf of Citigroup Inc. ("Citigroup" or the "Company"), seeking to recover for the Company its losses arising from exposure to the subprime lending market. Plaintiffs, shareholders of Citigroup, brought this action against current and former directors and officers of Citigroup, alleging, in essence, that the defendants breached their fiduciary duties by failing to properly monitor and manage the risks the Company faced from problems in the subprime lending market and for failing to properly disclose Citigroup's exposure to subprime assets. Plaintiffs allege that there were extensive "red flags" that should have given defendants notice of the problems that were brewing in the real estate and credit markets and that defendants ignored these warnings in the pursuit of short term profits and at the expense of the Company's long term viability.

Plaintiffs further allege that certain defendants are liable to the Company for corporate waste for (1) allowing the Company to purchase $2.7 billion in subprime loans from Accredited Home Lenders in March 2007 and from Ameriquest Home Mortgage in September 2007; (2) authorizing and not suspending the Company's share repurchase program in the first quarter of 2007, which allegedly resulted in the Company buying its own shares at "artificially inflated prices;" (3) approving

a multi-million dollar payment and benefit package for defendant Charles Prince, whom plaintiffs describe as largely responsible for Citigroup's problems, upon his retirement as Citigroup's CEO in November 2007; and (4) allowing the Company to invest in structured investment vehicles ("SIVs") that were unable to pay off maturing debt.

Pending before the Court is defendants' motion (1) to dismiss or stay the action in favor of an action pending in the Southern District of New York (the "New York Action") or (2) to dismiss the complaint for failure to state a claim under Court of Chancery Rule 12(b)(6) and for failure to properly plead demand futility under Court of Chancery Rule 23.1. For the reasons set forth below, the motion to stay or dismiss in favor of the New York Action is denied. The motion to dismiss is denied as to the claim in Count III for waste for approval of the November 4, 2007 Prince letter agreement. All other claims are dismissed for failure to adequately plead demand futility pursuant to Rule 23.1.

## I. BACKGROUND

### A. The Parties

Citigroup is a global financial services company whose businesses provide a broad range of financial services to consumers and businesses. Citigroup was incorporated in Delaware in 1988 and maintains its principal executive offices in New York, New York.

Defendants in this action are current and former directors and officers of Citigroup. The complaint names thirteen members of the Citigroup board of directors on November 9, 2007, when the first of plaintiffs' now-consolidated derivative actions was filed.[1] Plaintiffs allege that a majority of the director defendants were members of the Audit and Risk Management Committee ("ARM Committee") in 2007 and were considered audit committee financial experts as defined by the Securities and Exchange Commission.

Plaintiffs Montgomery County Employees' Retirement Fund, City of New Orleans Employees' Retirement System, Sheldon M. Pekin Irrevocable Descendants Trust Dated 10/01/01, and Carole Kops are all owners of shares of Citigroup stock.

### B. Citigroup's Exposure to the Subprime Crisis

Plaintiffs allege that since as early as 2006, defendants have caused and allowed Citigroup to engage in subprime lending[2] that ultimately left the Company exposed to massive losses by late 2007.[3] Beginning in late 2005, house prices, which many believe were artificially inflated by speculation and easily available credit, began to

---

1. The director defendants are C. Michael Armstrong, Alain J.P. Belda, George David, Kenneth T. Derr, John M. Deutch, Andrew N. Liveris, Anne M. Mulcahy, Richard D. Parsons, Roberto Hernández Ramirez, Judith Rodin, Robert E. Rubin, Robert L. Ryan, and Franklin A. Thomas (collectively, the "director defendants"). Plaintiffs and defendants agree that the director defendants constitute the board for demand futility purposes. The complaint also names (1) former Citigroup directors Ann Dibble Jordan, Klaus Kleinfeld, and Dudley C. Mecum and (2) former and current officers and senior management of Citigroup Charles Prince, Winfried

Bischoff, David C. Bushnell, Gary Crittenden, John C. Gerspach, Lewis B. Kaden, and Sallie L. Krawcheck.

2. "Subprime" generally refers to borrowers who do not qualify for prime interest rates, typically due to weak credit histories, low credit scores, high debt-burden ratios, or high loan-to-value ratios.

3. The facts are drawn from the complaint and taken as true for purposes of the motion to dismiss.

plateau, and then deflate. Adjustable rate mortgages issued earlier in the decade began to reset, leaving many homeowners with significantly increased monthly payments. Defaults and foreclosures increased, and assets backed by income from residential mortgages began to decrease in value. By February 2007, subprime mortgage lenders began filing for bankruptcy and subprime mortgages packaged into securities began experiencing increasing levels of delinquency. In mid–2007, rating agencies downgraded bonds backed by subprime mortgages.

Much of Citigroup's exposure to the subprime lending market arose from its involvement with collateralized debt obligations ("CDOs")—repackaged pools of lower rated securities that Citigroup created by acquiring asset-backed securities, including residential mortgage backed securities ("RMBSs"),[4] and then selling rights to the cash flows from the securities in classes, or tranches, with different levels of risk and return. Included with at least some of the CDOs created by Citigroup was a "liquidity put"—an option that allowed the purchasers of the CDOs to sell them back to Citigroup at original value.

According to plaintiffs, Citigroup's alleged $55 billion subprime exposure was in two areas of the Company's Securities & Banking Unit. The first portion totaled $11.7 billion and included securities tied to subprime loans that were being held until they could be added to debt pools for investors. The second portion included $43 billion of super-senior securities, which are portions of CDOs backed in part by RMBS collateral.[5]

By late 2007, it was apparent that Citigroup faced significant losses on its subprime-related assets, including the following as alleged by plaintiffs:

- *October 1, 2007:* Citigroup announced it would write-down approximately $1.4 billion on funded and unfunded highly leveraged finance commitments.
- *October 15, 2007:* Citigroup issued a press release reporting a net income of $2.38 billion, a 57% decline from the Company's prior year results.
- *November 4, 2007:* Citigroup announced significant declines on the fair value of the approximately $55 billion in the Company's U.S. subprime-related direct exposures, and estimated that further write downs would be between $8 and $11 billion.
- *November 6, 2007:* Citigroup disclosed that it provided $7.6 billion of emergency financing to the seven SIVs the Company operated after they were unable to repay maturing debt. The SIVs drew on the $10 billion of so-called committed liquidity provided by Citigroup. On December 13, 2007 Citigroup bailed out seven of its affiliated SIVs by bringing $49 billion in assets onto its balance sheet and taking full responsibility for the SIVs' $49 billion worth of assets.
- *January 15, 2008:* Citigroup announced it would take an additional $18.1 billion write-down for the fourth quarter 2007 and a quarterly loss of $9.83 billion. Citigroup also announced that the Company lowered its dividend to $0.32 per share, a 40% decline from the Company's previous dividend disbursement.

---

4. RMBSs are securities whose cash flows come from residential debt such as mortgages.

5. Rights to cash flows from CDOs are divided into tranches rated by credit risk, whereby the senior tranches are paid before the junior tranches.

- By March 2008, Citigroup shares traded below book value and the Company announced that it would lay off an additional 2,000 employees, bringing Citigroup's total layoff since the beginning of the subprime market crisis to more than 6,000.

- July 18, 2008: Citigroup announced it lost $2.5 billion in the second quarter, largely caused by $7.2 billion of write-downs of Citigroup's investments in mortgages and other loans and by weakness in the consumer market.

Plaintiffs also allege that Citigroup was exposed to the subprime mortgage market through its use of SIVs. Banks can create SIVs by borrowing cash (by selling commercial paper) and using the proceeds to purchase loans; in other words, the SIVs sell short term debt and buy longer-term, higher yielding assets. According to plaintiffs, Citigroup's SIVs invested in riskier assets, such as home equity loans, rather than the low-risk assets traditionally used by SIVs.

The problems in the subprime market left Citigroup's SIVs unable to pay their investors. The SIVs held subprime mortgages that had decreased in value, and the

normally liquid commercial paper market became illiquid. Because the SIVs could no longer meet their cash needs by attracting new investors, they had to sell assets at allegedly "fire sale" prices. In November 2007, Citigroup disclosed that it provided $7.6 billion of emergency financing to the seven SIVs the Company operated after they were unable to repay maturing debt. Ultimately, Citigroup was forced to bail out seven of its affiliated SIVs by bringing $49 billion in assets onto its balance sheet, notwithstanding that Citigroup previously represented that it would manage the SIVs on an arms-length basis.

### C. Plaintiffs' Claims

Plaintiffs allege that defendants are liable to the Company for breach of fiduciary duty for (1) failing to adequately oversee and manage Citigroup's exposure to the problems in the subprime mortgage market, even in the face of alleged "red flags" and (2) failing to ensure that the Company's financial reporting and other disclosures were thorough and accurate.[6] As will be more fully explained below, the "red flags" alleged in the eighty-six page Complaint are generally statements from public documents that reflect worsening

---

**6.** Plaintiffs also assert a claim for "reckless and gross mismanagement." Consol. Second Am. Derivative Compl. (hereinafter, "Compl.") ¶¶ 219–25. Delaware law does not recognize an independent cause of action against corporate directors and officers for reckless and gross mismanagement; such claims are treated as claims for breach of fiduciary duty. Delaware fiduciary duties are based in common law and have been carefully crafted to define the responsibilities of directors and managers, as fiduciaries, to the corporation. In defining these duties, the courts balance specific policy considerations such as the need to keep directors and officers accountable to shareholders and the degree to which the threat of personal liability may discourage beneficial risk taking. These common law standards thus govern the duties that directors and officers owe the corpora-

tion as well as claims such as those for "reckless and gross mismanagement," even if those claims are asserted separate and apart from claims of breach of fiduciary duty. *See Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 155–57 (Del.Ch. 2004); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2004 WL 2050527, at *6 (Del.Super.Sept.15, 2004) ("[A] claim that a corporate manager acted with gross negligence is the same as a claim that she breached her fiduciary duty of care."). Plaintiffs seem to agree that Count IV's claims for "reckless and gross mismanagement" do not assert a separate cause of action against defendants. In the two sentences of their answering brief on the motion to dismiss that address Count IV, plaintiffs equate Count IV to their *Caremark* claim in Count I. Because I find that Count I fails, it follows that Court IV also fails.

conditions in the financial markets, including the subprime and credit markets, and the effects those worsening conditions had on market participants, including Citigroup's peers. By way of example only, plaintiffs' "red flags" include the following:

- *May 27, 2005:* Economist Paul Krugman of the *New York Times* said he saw "signs that America's housing market, like the stock market at the end of the last decade, is approaching the final, feverish stages of a speculative bubble."

- *May 2006:* Ameriquest Mortgage, one of the United States' leading wholesale subprime lenders, announced the closing of each of its 229 retail offices and reduction of 3,800 employees.

- *February 12, 2007:* ResMae Mortgage, a subprime lender, filed for bankruptcy. According to *Bloomberg,* in its Chapter 11 filing, ResMae stated that "[t]he subprime mortgage market has recently been crippled and a number of companies stopped originating loans and United States housing sales have slowed and defaults by borrowers have risen."

- *April 18, 2007:* Freddie Mac announced plans to refinance up to $20 billion of loans held by subprime borrowers who would be unable to afford their adjustable-rate mortgages at the reset rate.

- *July 10, 2007:* Standard and Poor's and Moody's downgraded bonds backed by subprime mortgages.

- *August 1, 2007:* Two hedge funds managed by Bear Stearns that invested heavily in subprime mortgages declared bankruptcy.

- *August 9, 2007:* American International Group, one of the largest United States mortgage lenders, warned that mortgage defaults were spreading beyond the subprime sector, with delinquencies becoming more common among borrowers in the category just above subprime.

- *October 18, 2007:* Standard & Poor's cut the credit ratings on $23.35 billion of securities backed by pools of home loans that were offered to borrowers during the first half of the year. The downgrades even hit securities rated AAA, which was the highest of the ten investment-grade ratings and the rating of government debt.[7]

Plaintiffs also allege that the director defendants and certain other defendants are liable to the Company for waste for: (1) allowing the Company to purchase $2.7 billion in subprime loans from Accredited Home Lenders in March 2007 and from Ameriquest Home Mortgage in September 2007; (2) authorizing and not suspending the Company's share repurchase program in the first quarter of 2007, which allegedly resulted in the Company buying its own shares at "artificially inflated prices;" (3) approving a multi-million dollar payment and benefit package for defendant Prince upon his retirement as Citigroup's CEO in November 2007; and (4) allowing the Company to invest in SIVs that were unable to pay off maturing debt.

### D. The Procedural History

#### 1. The New York Action

The first New York Action was filed on November 6, 2007 in the United States District Court for the Southern District of New York. On August 22, 2008, the five

---

7. Compl. ¶¶ 73–74. I have provided only a small sample of the numerous "red flags" alleged in the Complaint.

pending derivative actions were consolidated as *In re Citigroup, Inc. Shareholder Derivative Litigation,* No 07 Civ. 9841, and on September 23, 2008, the Court appointed lead counsel and lead plaintiffs. Plaintiffs filed a consolidated complaint on November 10, 2008, alleging: (1) violation of the Securities Exchange Act of 1934 ("Exchange Act") § 10(b) and Rule 10b–5 (derivatively on behalf of Citigroup); (2) breach of fiduciary duties of care, loyalty, and good faith; (3) breach of fiduciary duty for insider trading and misappropriation of information; (4) breach of fiduciary duty of disclosure; (5) waste of corporate assets; and (6) unjust enrichment. Defendants filed a motion to dismiss on December 23, 2008, and pursuant to the schedule set by the Federal District Court, the motion to dismiss the New York Action will be fully briefed by late February 2009.

### 2. *The Delaware Action*

This action was commenced on November 9, 2007, and the four pending actions were consolidated on February 5, 2008. Defendants filed a motion to dismiss the Consolidated Amended Derivative Complaint on April 21, 2008. Plaintiffs responded by filing a Consolidated Second Amended Derivative Complaint (the "Complaint"), which was accepted by the Court on September 15, 2008. Pending before the Court is defendants' motion to dismiss or stay.

## II. MOTION TO DISMISS OR STAY IN FAVOR OF THE NEW YORK ACTION

### A. *Legal Standard*

■■■ Defendants seek a stay of this action in favor of the New York Action. Under *McWane,* this Court may, in the exercise of its discretion, stay an action "when there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties and the same issues."[8] Such discretion allows the Court, for reasons of comity and the fair and orderly administration of justice, to ensure that a plaintiff's choice of forum is not defeated and to properly confine litigation to the forum in which it is first commenced.[9] Where, however, the actions are contemporaneously filed such that the action pending elsewhere is not considered "first-filed," the Court will consider the motion "under the traditional *forum non conveniens* framework without regard to a *McWane*-type preference of one action over the other."[10] Where, as here, the actions were filed within the same general time frame, the Court considers the actions simultaneously filed so as to avoid a "race to the courthouse."[11] Because the actions were filed only a few days apart, I consider them contemporaneous.[12]

---

**8.** *McWane Cast Iron Pipe Corp. v. McDowell–Wellman Eng'g Co.,* 263 A.2d 281, 283 (Del. 1970).

**9.** *See id.*

**10.** *In re The Bear Stearns Cos. S'holder Litig.,* C.A. No. 3643–VCP, 2008 WL 959992, at *5 (Del.Ch. Apr. 9, 2008) (quoting *Rapoport v. The Litig. Trust of MDIP Inc.,* C.A. No. 1035–N, 2005 WL 3277911, at *2 (Del.Ch. Nov. 23, 2005)); *see County of York Employees Ret. Plan v. Merrill Lynch & Co.,* C.A. No. 4066–VCN, 2008 WL 4824053, at *3 (Del.Ch. Oct. 28, 2008).

**11.** *Merrill Lynch,* 2008 WL 4824053, at *3 (citing *Texas Instruments Inc. v. Cyrix Corp.,* C.A. No. 13288, 1994 WL 96983, at *3–4 (Del.Ch. Mar. 22, 1994)).

**12.** *Bear Stearns,* 2008 WL 959992, at *5 (treating actions filed three days apart as contemporaneous). The parties agree that the New York Action was first commenced on November 6, 2007. Plaintiffs assert that this action was first commenced on November 7, 2007—meaning it was filed the day after the New York Action. The Court's records, however, indicate that this action was first com-

■ Additionally, even where there is a first filed derivative or class action, this Court has recognized the difficulty presented by the *McWane* doctrine. A shareholder plaintiff in a derivative suit alleges claims in the right of the corporation rather than directly; thus, representative actions raise the concern that the best interest of the class might diverge from the best interest of the representative plaintiff's attorneys. To avoid exacerbating this potential conflict, the Court gives less weight to the first filed status of a lawsuit, and instead "will examine more closely the relevant factors bearing on where the case should best proceed, using something akin to a *forum non conveniens* analysis."[13] I turn now to the *forum non conveniens* standard.

■ When assessing whether to stay or dismiss an action under the doctrine of *forum non conveniens* this Court considers six factors:

1) the applicability of Delaware law in the action; 2) the relative ease of access

to proof; 3) the availability of compulsory process for witnesses; 4) the pendency or non-pendency of any similar actions in other jurisdictions; 5) the possibility of a need to view the premises; and 6) all other practical considerations which would serve to make the trial easy, expeditious and inexpensive.[14]

A party is not entitled to a stay as a matter of right; rather, the granting of a motion to stay rests with the sound discretion of the Court. This Court is rightfully hesitant to grant motions to stay based on *forum non conveniens*, and the doctrine is not a vehicle by which the Court should determine which forum would be most convenient for the parties.[15] Rather, a defendant bears the burden of showing entitlement to a stay or dismissal on grounds of *forum non conveniens:* in a case where a stay will likely have substantially the same effect as a dismissal, the defendant must show that one or more of the factors, either separately or together, would subject the defendant to sufficient hardship to warrant staying the proceedings.[16]

menced on November 9, 2007. Even assuming the November 9, 2007 filing, however, I still consider the actions contemporaneously filed.

13. *Biondi v. Scrushy*, 820 A.2d 1148, 1159 & n. 22 (Del.Ch.2003) ("Where one person seeking to act in a representative capacity chooses to litigate in Delaware and another in a different forum, there is little reason to accord decisive weight to the priority of filing, at least where no prejudicial delay has occurred. Other factors bearing on the convenience of the parties and the interests of Delaware in resolving the dispute will be more important."). *See Ryan v. Gifford*, 918 A.2d 341, 349 (Del.Ch.2007).

14. *In re Chambers Dev. Co. S'holders Litig.*, C.A. No. 12508, 1993 WL 179335, at *2 (Del. Ch. May 20, 1993).

15. *See Taylor v. LSI Logic Corp.*, 689 A.2d 1196, 1199 (Del.1997) ("An action may not be dismissed upon bare allegations of inconven-

ience without a particularized showing of the hardships relied upon.").

16. *Bear Stearns*, 2008 WL 959992, at *5 ("Motions to stay litigation on grounds of *forum non conveniens* are granted only in the rare case."); *Aveta, Inc. v. Colon*, 942 A.2d 603, 608 (Del.Ch.2008) ("[T]o achieve a stay or dismissal for *forum non conveniens*, a defendant must demonstrate that litigating in the plaintiff's chosen forum would present an overwhelming hardship."); *Ryan*, 918 A.2d at 351 (citing *Berger v. Intelident Solutions, Inc.*, 906 A.2d 134 (Del.2006)). I am aware of the so-called debate as to whether there exists a different standard for staying, rather than dismissing, litigation on *forum non conveniens* grounds. *See Kolber v. Holyoke Shares, Inc.*, 213 A.2d 444, 446–47 (Del.1965); *Sprint Nextel Corp. v. iPCS, Inc.*, C.A. No. 3746–VCP, 2008 WL 4516645, at *2 n. 8 (Del.Ch. Oct. 8, 2008); *Bear Stearns*, 2008 WL 959992, at *5 n. 22; *Brandin v. Deason*, 941 A.2d 1020, 1024 n. 13 (Del.Ch.2007); *HFTP Invs. v. AR-IAD Pharm., Inc.*, 752 A.2d 115, 121 (Del.Ch.

### B. Forum Non Conveniens Analysis

■ Although there may be some overlap with the New York Action, defendants have failed to meet their burden of showing hardship that would entitle them to a stay or dismissal in favor of the New York Action.[17] First, Delaware law applies to this action. Citigroup is incorporated in Delaware, and the fiduciary duties owed by its officers and directors are governed by Delaware law. Defendants argue that this case does not pose novel issues of Delaware law and only calls for application of the established doctrines governing *Caremark* and waste claims to the facts in this case. Of course, the contextual application of Delaware fiduciary duty law is not novel. This case, however, raises important issues regarding the standards governing directors and officers of Dela-

ware corporations, and Delaware has an ongoing interest in applying our law to director conduct in the context of current market conditions—conditions which change rapidly and pose new challenges for directors and officers of Delaware corporations.[18]

Second, the relative ease of access to proof should not be accorded much weight in this case. Although access to proof may be marginally easier in New York, collecting evidence from other jurisdictions is regularly handled with ease in this Court.[19]

Third, the availability of compulsory process for witnesses should not be given much weight in this case. Although witnesses may be located in New York, "the process of issuing commissions to take discovery in another state is efficient, effec-

1999). I see no reason, however, to make such a distinction in a case in which a stay would likely have the same ultimate effect as a dismissal. This Court has clearly articulated the policy justifications for requiring a showing of overwhelming hardship in order to dismiss on grounds of *forum non conveniens*, for example, (1) the plaintiff's interest in litigating in the chosen forum, (2) Delaware's interest in deciding issues of Delaware law, and (3) Delaware's interest in adjudicating disputes involving Delaware entities. *See, e.g., In re Topps Co. S'holders Litig.*, 924 A.2d 951, 956–64 (Del.Ch.2007). Those same policy justifications apply when the Court is considering a motion to stay on grounds of *forum non conveniens* that would have the same practical effect as dismissal.

While there are certainly significant procedural differences, in many cases the practical effect of staying litigation in favor of a lawsuit pending in another jurisdiction is the same as ordering dismissal. A stay in favor of another action results in the action in Delaware being put on hold until the resolution of the action in another jurisdiction, at which point principles of *res judicata* would likely apply. In light of this practical consideration, this Court must defer to the doctrine of the Supreme Court of this State, and the policy considerations underlying such doctrine, and should

be extremely chary about disposing of cases on grounds of *forum non conveniens*, either by granting dismissal or a stay. *See, e.g., Candlewood Timber Group, LLC v. Pan Am. Energy, LLC*, 859 A.2d 989, 998 (Del.2004); *MarLand Indus. Contractors, Inc. v. Caribbean Petroleum Ref., L.P.*, 777 A.2d 774, 777–778 (Del.2001). To do otherwise would allow and encourage defendants to move this Court for a stay, rather than a dismissal, and thereby achieve the same result without the showing of hardship articulated by the Supreme Court.

17. Alternatively, even if the Court were to apply a preponderance of the evidence standard rather than requiring a showing of hardship, this case would still not warrant a stay. As in *Merrill Lynch*, "nothing in the *forum non conveniens* analysis offers any persuasive reason for rejecting the Plaintiff's choice of forum for the bringing of its claims." *Merrill Lynch*, 2008 WL 4824053, at *4.

18. *See id.* at *3; *Topps*, 924 A.2d at 954 ("When new issues arise, the state of incorporation has a particularly strong interest in addressing them, and providing guidance.").

19. *See Merrill Lynch*, 2008 WL 4824053, at *3. It is also highly unlikely that this case will require a view of the premises.

tive, and routinely accomplished."[20] Defendants have failed to identify documents or witnesses that will be unavailable if litigation continues in Delaware.

Fourth, although there is an action pending in New York that arises out of the same nucleus of operative fact, the pendency of such action does not give rise to the hardship required to establish entitlement to a stay. Although some overlap may result, the pendency of a similar action in another jurisdiction regarding corporate governance issues under Delaware law does not necessarily override the interest of Delaware in resolving such claims. Defendants argue that a stay should be granted because the New York Court is the only court capable of granting complete relief because the New York Action includes claims that can only be adjudicated in federal court, specifically claims under Exchange Act § 10(b) and Rule 10b–5. In response, plaintiffs argue that this Court should refuse to grant a stay because the complaint in the New York Action contains meager *Caremark* allegations compared to the Complaint in this action. According to plaintiffs, the claims in the New York Action are primarily for securities fraud and insider trading and set forth demand futility allegations based on defendants' misrepresentations, omissions, and insider sales.

While the authority of one Court to grant complete relief may be a relevant consideration under the pendency of similar actions prong of the *forum non conveniens* analysis, it is not outcome determinative. In this case, it does not even approach the required showing of hardship defendants would have to make in order to warrant a stay of the proceedings, and I need not further scrutinize the arguments on this prong of the test.

Finally, the "important and atypical practical considerations," described by the *Bear Stearns* Court as *sui generis*, are not present in this case.[21] In *Bear Stearns*, the Court was faced with a case involving the Federal Reserve Bank and the Department of the Treasury in which inconsistent rulings could "negatively impact not only the parties involved, but also the U.S. financial markets and the national economy."[22] In light of, among other things, "the persuasive practical reasons against embarking unnecessarily on a collision course with our sister court in New York in these extraordinary circumstances," the Court granted the motion for a stay after finding that the defendants had shown that failure to stay the action would result in overwhelming hardship.[23] Defendants in this action have not shown analogous practical circumstances or that proceeding in Delaware would result in significant hardship. The essence of defendants' argument in favor of the stay is that the Court in the New York Action is capable of hearing all the claims and that it would be more expedient and convenient to litigate in New York rather than Delaware.[24] Such considerations, however, without more, are not sufficient to entitle defendants to a stay on *forum non conveniens* grounds.

20. *Id.*

21. *Bear Stearns*, 2008 WL 959992, at *6–8.

22. *Id.* at *8; *see Merrill Lynch*, 2008 WL 4824053, at *4.

23. *Bear Stearns*, 2008 WL 959992, at *8.

24. The New York Action is pending in the Southern District of New York before Judge Sidney H. Stein. The decision not to stay this action should not be seen as reflecting on the expertise of Judge Stein, who, to my knowledge, is an excellent jurist, fully capable of adjudicating issues of Delaware law.

## III. THE MOTION TO DISMISS UNDER RULE 23.1

### A. The Legal Standard for Demand Excused

The decision whether to initiate or pursue a lawsuit on behalf of the corporation is generally within the power and responsibility of the board of directors.[25] This follows from the "cardinal precept of the General Corporation Law of the State of Delaware ... that directors, rather than shareholders, manage the business and affairs of the corporation."[26] Accordingly, in order to cause the corporation to pursue litigation, a shareholder must either (1) make a pre-suit demand by presenting the allegations to the corporation's directors, requesting that they bring suit, and showing that they wrongfully refused to do so, or (2) plead facts showing that demand upon the board would have been futile.[27] Where, as here, a plaintiff does not make a pre-suit demand on the board of directors, the complaint must plead with particularity facts showing that a demand on the board would have been futile.[28] The purpose of the demand requirement is not to insulate defendants from liability; rather, the demand requirement and the strict requirements of factual particularity under Rule 23.1 "exist[ ] to preserve the primacy of board decision-making regarding legal claims belonging to the corporation."[29]

Under the familiar *Aronson* test, to show demand futility, plaintiffs must provide particularized factual allegations that raise a reasonable doubt that "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."[30] Where, however, plaintiffs complain of board inaction and do not challenge a specific decision of the board, there is no "challenged transaction," and the ordinary *Aronson* analysis does not apply.[31] Instead, to show demand futility where the subject of the derivative suit is not a business decision of the board, a plaintiff must allege particularized facts that "create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[32]

In evaluating whether demand is excused, the Court must accept as true the well pleaded factual allegations in the Complaint. The pleadings, however, are held to a higher standard under Rule 23.1 than under the permissive notice pleading standard under Court of Chancery Rule 8(a). To establish that demand is excused under Rule 23.1, the pleadings must comply with "stringent requirements of factual particularity" and set forth "particularized factual statements that are essential to the

25. 8 *Del. C.* § 141(a).

26. *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984).

27. *See Stone v. Ritter*, 911 A.2d 362, 366–67 (Del.2006).

28. Ct. Ch. R. 23.1(a); *see Stone*, 911 A.2d at 367 n. 9; *Brehm v. Eisner*, 746 A.2d 244, 254 (Del.2000).

29. *Am. Int'l Group, Inc., Consol. Derivative Litig.*, 965 A.2d 763, 807–09, 2009 WL 366613, at *29 (Del.Ch.2009).

30. *Brehm*, 746 A.2d at 253 (quoting *Aronson*, 473 A.2d at 814).

31. *Rales v. Blasband*, 634 A.2d 927, 933–34 (Del.1993).

32. *Id.* at 934.

claim." [33] "A prolix complaint larded with conclusory language ... does not comply with these fundamental pleading mandates." [34]

Plaintiffs have not alleged that a majority of the board was not independent for purposes of evaluating demand. Rather, as to the claims for waste asserted in Count III, plaintiffs allege that the approval of certain transactions did not constitute a valid exercise of business judgment under the second prong of the *Aronson* test. Plaintiffs allege that demand is futile as to Counts I, II, and IV because the director defendants are not able to exercise disinterested business judgment in responding to a demand because their failure of oversight subjects them to a substantial likelihood of personal liability. According to plaintiffs, the director defendants face a substantial threat of personal liability because their conscious disregard of their duties and lack of proper supervision and oversight caused the Company to be overexposed to risk in the subprime mortgage market.

Demand is not excused solely because the directors would be deciding to sue themselves. [35] Rather, demand will be excused based on a possibility of personal director liability only in the rare case when a plaintiff is able to show director conduct that is "so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." [36]

### B. Demand Futility Regarding Plaintiffs' Fiduciary Duty Claims

Plaintiffs' argument is based on a theory of director liability famously articulated by former-Chancellor Allen in *In re Caremark*. [37] Before *Caremark*, in *Graham v. Allis–Chalmers Manufacturing Company*, [38] the Delaware Supreme Court, in response to a theory that the Allis–Chalmers directors were liable because they should have known about employee violations of federal anti-trust laws, held that "absent cause for suspicion there is no duty upon the directors to install and operate a corporate system of espionage to ferret out wrongdoing which they have no reason to

33. *Brehm*, 746 A.2d at 254.

34. *Id.*

35. *Jacobs v. Yang*, C.A. No. 206–N, 2004 WL 1728521, at *6 n. 31 (Del.Ch. Aug. 2, 2004).

36. *Aronson*, 473 A.2d at 815. The Complaint appears to allege that demand on defendants Rubin and Ramirez would be futile because 1) Rubin faces a substantial threat of personal liability because he benefited personally by wrongfully selling stock while in possession of material nonpublic information; 2) Rubin is beholden to defendants Belda, Derr, and Parsons due to the extraordinary monetary compensation and other benefits they approved for him while he was a director and despite his lack of operational responsibility; and 3) Ramirez is not independent because he ran a subsidiary of Citigroup and received security and other services valued at more than $2 million from Citigroup while doing

so. *See* Compl. ¶¶ 181–82. The Court does not need to determine the adequacy of these demand futility allegations because plaintiffs have not made similar individualized allegations regarding the other director defendants. Thus, even if the allegations in the Complaint are sufficient to excuse demand as to Rubin and Ramirez, plaintiffs have still failed to properly plead demand futility for a majority of the director defendants. As further explained below, instead of providing similar individualized assertions for the other director defendants, plaintiffs rely on the "group" accusation mode of pleading demand futility. Had plaintiffs provided individual allegations as to each of the director defendants, the outcome of this case may have been different.

37. *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del.Ch.1996).

38. 188 A.2d 125 (Del.1963).

suspect exists." [39] Over thirty years later, in the context of approval of a settlement of a class action, former-Chancellor Allen took the opportunity to revisit the duty to monitor under Delaware law. In *Caremark*, the plaintiffs alleged that the directors were liable because they should have known that certain officers and employees were violating the federal Anti–Referral Payments Law. In analyzing these claims, the Court began, appropriately, by reviewing the duty of care and the protections of the business judgment rule.

With regard to director liability standards, the Court distinguished between (1) "*a board decision* that results in a loss because that decision was ill advised or 'negligent'" and (2) "an *unconsidered failure of the board to act* in circumstances in which due attention would, arguably, have prevented the loss." [40] In the former class of cases, director action is analyzed under the business judgment rule, which prevents judicial second guessing of the decision if the directors employed a rational process and considered all material information reasonably available—a standard measured by concepts of gross negligence. [41] As former-Chancellor Allen explained:

> What should be understood, but may not widely be understood by courts or commentators who are not often required to face such questions, is that compliance with a director's duty of care can never appropriately be judicially determined by reference to *the content of the board decision* that leads to a corporate loss, apart from consideration of the good faith *or* rationality of the process em-

ployed. That is, whether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through "stupid" to "egregious" or "irrational", provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in *a good faith* effort to advance corporate interests. To employ a different rule—one that permitted an "objective" evaluation of the decision—would expose directors to substantive second guessing by ill-equipped judges or juries, which would, in the long-run, be injurious to investor interests. Thus, the business judgment rule is process oriented and informed by a deep respect for all *good faith* board decisions. [42]

In the latter class of cases, where directors are alleged to be liable for a failure to monitor liability creating activities, the *Caremark* Court, in a reassessment of the holding in *Graham*, stated that while directors could be liable for a failure to monitor, "only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability." [43]

In *Stone v. Ritter*, the Delaware Supreme Court approved the *Caremark* standard for director oversight liability and made clear that liability was based on the concept of good faith, which the *Stone* Court held was embedded in the fiduciary duty of loyalty and did not constitute a freestanding fiduciary duty that

39. *Id.* at 130.

40. *Caremark*, 698 A.2d at 967.

41. *Id.; see Brehm*, 746 A.2d at 259.

42. *Caremark*, 698 A.2d at 967–68 (footnotes omitted).

43. *Id.* at 971.

could independently give rise to liability.[44] As the *Stone* Court explained:

> *Caremark* articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations. Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.[45]

Thus, to establish oversight liability a plaintiff must show that the directors *knew* they were not discharging their fiduciary obligations or that the directors demonstrated a *conscious* disregard for their responsibilities such as by failing to act in the face of a known duty to act.[46] The test

is rooted in concepts of bad faith; indeed, a showing of bad faith is a *necessary condition* to director oversight liability.[47]

### 1. Plaintiffs' Caremark Allegations

Plaintiffs' theory of how the director defendants will face personal liability is a bit of a twist on the traditional *Caremark* claim. In a typical *Caremark* case, plaintiffs argue that the defendants are liable for damages that arise from a failure to properly monitor or oversee employee misconduct or violations of law. For example, in *Caremark* the board allegedly failed to monitor employee actions in violation of the federal Anti–Referral Payments Law; in *Stone,* the directors were charged with a failure of oversight that resulted in liability for the company because of employee violations of the federal Bank Secrecy Act.[48]

In contrast, plaintiffs' *Caremark* claims are based on defendants' alleged failure to properly monitor Citigroup's *business risk,* specifically its exposure to the subprime mortgage market. In their answering brief, plaintiffs allege that the director defendants are personally liable under *Caremark* for failing to "make a good faith

---

44. *Stone,* 911 A.2d at 370.

45. *Id.* (footnotes omitted).

46. *See Guttman v. Huang,* 823 A.2d 492, 506 (Del.Ch.2003) ("[T]he [*Caremark*] opinion articulates a standard for liability for failures of oversight that requires a showing that the directors breached their duty of loyalty by failing to attend to their duties in good faith. Put otherwise, the decision premises liability on a showing that the directors were conscious of the fact that they were not doing their jobs.") (footnote omitted).

47. *Stone,* 911 A.2d at 369; *Desimone v. Barrows,* 924 A.2d 908, 935 (Del.Ch.2007) ("*Caremark* itself encouraged directors to act with reasonable diligence, but plainly held that director liability for failure to monitor required a finding that the directors acted with the

state of mind traditionally used to define the mindset of a disloyal director—bad faith—because their indolence was so persistent that it could not be ascribed to anything other than a knowing decision not to even try to make sure the corporation's officers had developed and were implementing a prudent approach to ensuring law compliance. By reinforcing that a scienter-based standard applies to claims in the delicate monitoring context, *Stone* ensured that the protections that exculpatory charter provisions afford to independent directors against damage claims would not be eroded.") (footnotes omitted).

48. *See, e.g., David B. Shaev Profit Sharing Account v. Armstrong,* C.A. No. 1449–N, 2006 WL 391931, at *2 (Del.Ch. Feb. 13, 2006) (*Caremark* claims for failure to discover involvement in allegedly fraudulent business practices).

attempt to follow the procedures put in place or fail[ing] to assure that adequate and proper corporate information and reporting systems existed that would enable them to be fully informed regarding Citigroup's risk to the subprime mortgage market."[49] Plaintiffs point to so-called "red flags" that should have put defendants on notice of the problems in the subprime mortgage market and further allege that the board should have been especially conscious of these red flags because a majority of the directors (1) served on the Citigroup board during its previous Enron related conduct and (2) were members of the ARM Committee and considered financial experts.

Although these claims are framed by plaintiffs as *Caremark* claims, plaintiffs' theory essentially amounts to a claim that the director defendants should be personally liable to the Company because they failed to fully recognize the risk posed by subprime securities. When one looks past the lofty allegations of duties of oversight and red flags used to dress up these claims, what is left appears to be plaintiff shareholders attempting to hold the director defendants personally liable for making (or allowing to be made) business decisions that, in hindsight, turned out poorly for the Company. Delaware Courts have faced these types of claims many times and have developed doctrines to deal with them—the fiduciary duty of care and the business judgment rule. These doctrines properly focus on the decision-making process rather than on a substantive evaluation of the merits of the decision.

This follows from the inadequacy of the Court, due in part to a concept known as hindsight bias,[50] to properly evaluate whether corporate decision-makers made a "right" or "wrong" decision.

The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[51] The burden is on plaintiffs, the party challenging the directors' decision, to rebut this presumption.[52] Thus, absent an allegation of interestedness or disloyalty to the corporation, the business judgment rule prevents a judge or jury from second guessing director decisions if they were the product of a rational process and the directors availed themselves of all material and reasonably available information. The standard of director liability under the business judgment rule "is predicated upon concepts of gross negligence."[53]

Additionally, Citigroup has adopted a provision in its certificate of incorporation pursuant to 8 *Del. C.* § 102(b)(7) that exculpates directors from personal liability for violations of fiduciary duty, except for, among other things, breaches of the duty of loyalty or actions or omissions not in good faith or that involve intentional misconduct or a knowing violation of law. Because the director defendants are "exculpated from liability for certain conduct, 'then a serious threat of liability may only be found to exist if the plaintiff pleads a

---

49. Pls.' Answering Br. at 2.

50. "Hindsight bias is the tendency for people with knowledge of an outcome to exaggerate the extent to which they believe that outcome could have been predicted." Hal R. Arkes & Cindy A. Schipani, *Medical Malpractice v. The Business Judgment Rule: Differences in Hindsight Bias*, 73 OR. L.REV. 587, 587 (1994).

51. *Aronson*, 473 A.2d at 812.

52. *Id.*

53. *Id.*

*non-exculpated* claim against the directors based on particularized facts.' "[54] Here, plaintiffs have not alleged that the directors were interested in the transaction and instead root their theory of director personal liability in bad faith.

 The Delaware Supreme Court has stated that bad faith conduct may be found where a director "intentionally acts with a purpose other than that of advancing the best interests of the corporation, ... acts with the intent to violate applicable positive law, or ... intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."[55] More recently, the Delaware Supreme Court held that when a plaintiff seeks to show that demand is excused because directors face a substantial likelihood of liability where "directors are exculpated from liability except for claims based on 'fraudulent,' 'illegal' or 'bad faith' conduct, a plaintiff must also plead particularized facts that demonstrate that the directors acted with scienter, *i.e.*, that they had 'actual or constructive knowledge' that their conduct was legally improper."[56] A plaintiff can thus plead bad faith by alleging with particularity that a director *knowingly* violated a fiduciary duty or failed to act in violation of a *known* duty to act, demonstrating a *conscious* disregard for her duties.

Turning now specifically to plaintiffs' *Caremark* claims, one can see a similarity between the standard for assessing oversight liability and the standard for assessing a disinterested director's decision under the duty of care when the company has adopted an exculpatory provision pursuant to § 102(b)(7). In either case, a plaintiff can show that the director defendants will be liable if their acts or omissions constitute bad faith. A plaintiff can show bad faith conduct by, for example, properly alleging particularized facts that show that a director *consciously* disregarded an obligation to be reasonably informed about the business and its risks or *consciously* disregarded the duty to monitor and oversee the business.

The Delaware Supreme Court made clear in *Stone* that directors of Delaware corporations have certain responsibilities to implement and monitor a system of oversight; however, this obligation does not eviscerate the core protections of the business judgment rule—protections designed to allow corporate managers and directors to pursue risky transactions without the specter of being held personally liable if those decisions turn out poorly. Accordingly, the burden required for a plaintiff to rebut the presumption of the business judgment rule by showing gross negligence is a difficult one, and the burden to show bad faith is even higher. Additionally, as former-Chancellor Allen noted in *Caremark,* director liability based on the duty of oversight "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[57] The presumption of the business judgment rule, the protection of an exculpatory § 102(b)(7) provision, and the difficulty of proving a *Caremark* claim together function to place an extremely high burden on a plaintiff to state a claim for personal director liability for a failure to see the extent of a company's business risk.

---

**54.** *Wood v. Baum,* 953 A.2d 136, 141 (Del. 2008) (quoting *Guttman,* 823 A.2d at 501).

**55.** *In re Walt Disney Co. Derivative Litig.,* 906 A.2d 27, 67 (Del.2006).

**56.** *Wood,* 953 A.2d at 141.

**57.** *Caremark,* 698 A.2d at 967.

To the extent the Court allows shareholder plaintiffs to succeed on a theory that a director is liable for a failure to monitor business risk, the Court risks undermining the well settled policy of Delaware law by inviting Courts to perform a hindsight evaluation of the reasonableness or prudence of directors' business decisions. Risk has been defined as the chance that a return on an investment will be different that expected. The essence of the business judgment of managers and directors is deciding how the company will evaluate the trade-off between risk and return. Businesses—and particularly financial institutions—make returns by taking on risk; a company or investor that is willing to take on more risk can earn a higher return. Thus, in almost any business transaction, the parties go into the deal with the knowledge that, even if they have evaluated the situation correctly, the return could be different than they expected.

It is almost impossible for a court, in hindsight, to determine whether the directors of a company properly evaluated risk and thus made the "right" business decision.[58] In any investment there is a chance that returns will turn out lower than expected, and generally a smaller chance that they will be far lower than expected. When investments turn out poorly, it is possible that the decision-maker evaluated the deal correctly but got "unlucky" in that a huge loss—the probability of which was very small—actually happened. It is also possible that the decision-maker improperly evaluated the

risk posed by an investment and that the company suffered large losses as a result.

Business decision-makers must operate in the real world, with imperfect information, limited resources, and an uncertain future. To impose liability on directors for making a "wrong" business decision would cripple their ability to earn returns for investors by taking business risks. Indeed, this kind of judicial second guessing is what the business judgment rule was designed to prevent, and even if a complaint is framed under a *Caremark* theory, this Court will not abandon such bedrock principles of Delaware fiduciary duty law. With these considerations and the difficult standard required to show director oversight liability in mind, I turn to an evaluation of the allegations in the Complaint.

a. The Complaint Does Not Properly Allege Demand Futility for Plaintiffs' Fiduciary Duty Claims

■ In this case, plaintiffs allege that the defendants are liable for failing to properly monitor the risk that Citigroup faced from subprime securities. While it may be possible for a plaintiff to meet the burden under some set of facts, plaintiffs in this case have failed to state a *Caremark* claim sufficient to excuse demand based on a theory that the directors did not fulfill their oversight obligations by failing to monitor the business risk of the company.

The allegations in the Complaint amount essentially to a claim that Citigroup suffered large losses and that there were certain warning signs that could or should have put defendants on notice of the busi-

---

**58.** *See* Stephen M. Bainbridge, *The Business Judgment Rule as Abstention Doctrine*, 57 Vand. L.Rev. 83, 114–15 (2004) ("[T]here is a substantial risk that suing shareholders and reviewing judges will be unable to distinguish between competent and negligent management because bad outcomes often will be re-

garded, ex post, as having been foreseeable and, therefore, preventable ex ante. If liability results from bad outcomes, without regard to the ex ante quality of the decision or the decision-making process, however, managers will be discouraged from taking risks.") (footnotes omitted).

ness risks related to Citigroup's investments in subprime assets. Plaintiffs then conclude that because defendants failed to prevent the Company's losses associated with certain business risks, they must have consciously ignored these warning signs or knowingly failed to monitor the Company's risk in accordance with their fiduciary duties.[59] Such conclusory allegations, however, are not sufficient to state a claim for failure of oversight that would give rise to a substantial likelihood of personal liability, which would require particularized factual allegations demonstrating bad faith by the director defendants.

Plaintiffs do not contest that Citigroup had procedures and controls in place that were designed to monitor risk. Plaintiffs admit that Citigroup established the ARM Committee and in 2004 amended the ARM Committee charter to include the fact that one of the purposes of the ARM Committee was to assist the board in fulfilling its oversight responsibility relating to policy standards and guidelines for risk assessment and risk management.[60] The ARM Committee was also charged with, among other things, (1) discussing with management and independent auditors the annual audited financial statements, (2) reviewing with management an evaluation of Citigroup's internal control structure, and (3) discussing with management Citigroup's major credit, market, liquidity, and operational risk exposures and the steps taken by management to monitor and control such exposures, including Citigroup's risk assessment and risk management policies.[61] According to plaintiffs' own allegations, the ARM Committee met eleven times in 2006 and twelve times in 2007.[62]

Plaintiffs nevertheless argue that the director defendants breached their duty of oversight either because the oversight mechanisms were not adequate or because the director defendants did not make a good faith effort to comply with the established oversight procedures. To support this claim, the Complaint alleges numerous facts that plaintiffs argue should have put the director defendants on notice of the impending problems in the subprime mortgage market and Citigroup's exposure thereto. Plaintiffs summarized some of these "red flags" in their answering brief as follows:

- the steady decline of the housing market and the impact the collapsing bubble would have on mortgages and subprime backed securities since as early as 2005;
- December 2005 guidance from the FASB staff—"The FASB staff is aware of loan products whose contractual features may increase the exposure of the originator, holder, investor, guarantor, or servicer to risk of nonpayment or realization.";
- the drastic rise in foreclosure rates starting in 2006;
- several large subprime lenders reporting substantial losses and filing for bankruptcy starting in 2006;
- billions of dollars in losses reported by Citigroup's peers, such as Bear Stearns and Merrill Lynch.

Plaintiffs argue that demand is excused because a majority of the director defendants face a substantial likelihood of personal liability because they were charged with management of Citigroup's risk as members of the ARM Committee and as audit committee financial experts and

**59.** Pls.' Answering Br. at 39–40.

**60.** Compl. ¶ 185.

**61.** *Id.* ¶ 187.

**62.** *Id.* ¶ 189.

failed to properly oversee and monitor such risk.[63] As explained above, however, to establish director oversight liability plaintiffs would ultimately have to prove bad faith conduct by the director defendants. Plaintiffs fail to plead any particularized factual allegations that raise a reasonable doubt that the director defendants acted in good faith.

The warning signs alleged by plaintiffs are not evidence that the directors consciously disregarded their duties or otherwise acted in bad faith; at most they evidence that the directors made bad business decisions. The "red flags" in the Complaint amount to little more than portions of public documents that reflected the worsening conditions in the subprime mortgage market and in the economy generally. Plaintiffs fail to plead "particularized facts suggesting that the Board was presented with 'red flags' alerting it to potential misconduct" at the Company.[64] That the director defendants knew of signs of a deterioration in the subprime mortgage market, or even signs suggesting that conditions could decline further, is not sufficient to show that the directors were or should have been aware of any wrongdoing at the Company or were consciously disregarding a duty somehow to prevent Citigroup from suffering losses.[65] Nothing about plaintiffs' "red flags" supports plaintiffs' conclusory allegation that "defendants have not made a good faith attempt to assure that adequate and proper corporate information and reporting systems existed that would enable them to be fully informed regarding Citigroup's risk to the subprime mortgage market."[66] Indeed, plaintiffs' allegations do not even specify how the board's oversight mechanisms were inadequate or how the director defendants knew of these inadequacies and consciously ignored them. Rather, plaintiffs seem to hope the Court will accept the conclusion that since the Company suffered large losses, and since a properly functioning risk management system would have avoided such losses, the directors must have breached their fiduciary duties in allowing such losses.

63. Compl. ¶ 189; Pls.' Answering Br. at 41–45. Directors with special expertise are not held to a higher standard of care in the oversight context simply because of their status as an expert. *See Canadian Commercial Workers Indus. Pension Plan v. Alden*, C.A. No. 1184–N, 2006 WL 456786, at *7 n. 54 (Del.Ch. Feb. 22, 2006); *see also* E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992–2004? A Retrospective on Some Key Developments*, 153 U. Pa. L.Rev. 1399, 1445–47 (2005). Directors of a committee charged with oversight of a company's risk have additional responsibilities to monitor such risk; however, such responsibility does not change the standard of director liability under *Caremark* and its progeny, which requires a showing of bad faith. Evaluating director action under the bad faith standard is a contextual and fact specific inquiry and what a director knows and understands is, of course, relevant to such an inquiry. *See In re Emerging Commc'ns, Inc. S'holders Litig.*, C.A. No. 16415, 2004 WL 1305745, at *39–40 (Del.Ch. May 3, 2004). Even accepting, however, that a majority of the directors were members of the ARM Committee and considered audit committee financial experts, plaintiffs have not alleged facts showing that they demonstrated a conscious disregard for duty, or any other conduct or omission that would constitute bad faith. Even directors who are experts are shielded from judicial second guessing of their business decisions by the business judgment rule.

64. *Shaev*, 2006 WL 391931, at *3.

65. That plaintiffs are unable to point to specific wrongdoing within the Company that caused Citigroup's losses from exposure to the subprime mortgage market further supports my hypothesis that this case is not truly a *Caremark* case, but rather a straightforward claim of breach of the fiduciary duty of care.

66. Pls.' Answering Br. at 62.

Moving from such general ipse dixit syllogisms to the more specific, plaintiffs argue that the director defendants, and especially those nine directors who were on the board at the time, "should have been especially sensitive to the red flags in the marketplace in light of the Company's prior involvement in the Enron Corporation debacle and other financial scandals earlier in the decade."[67] Plaintiffs also allege that the director defendants should have been especially alert to the dangers of transactions involving SIVs because SIVs were involved in Citigroup's transactions with Enron that resulted in liability for the Company. Plaintiffs allege that Citigroup helped finance transactions that allowed Enron to hide its true financial condition and resulted in Citigroup paying approximately $120 million in penalties and disgorgement as well as agreeing to new risk management procedures designed to prevent similar conduct.

Plaintiffs fail in their attempt to impose some sort of higher standard of liability on the director defendants that were on Citigroup's board at the time of its involvement with Enron. They have utterly failed to show how Citigroup's involvement with the financial scandals at Enron has any relevance to Citigroup's investments in subprime securities. Plaintiffs cite *McCall v. Scott*[68] to support the proposition that directors who were on the board during previous misconduct should be sensitive to similar circumstances which had previously prompted investigations. That case, however, actually shows how plaintiffs' attempt to impose a higher standard on the directors because of the Enron scandal is

inadequate. Unlike here, the plaintiffs in *McCall* alleged numerous specific instances of widespread, prevalent wrongdoing throughout the company and the mechanisms by which the wrongdoing came to the board's attention.[69] The Sixth Circuit in *McCall* did *not*, as plaintiffs assert, hold that alleged prior, *unrelated* wrongdoing would make directors "sensitive to similar circumstances."[70] Unlike plaintiffs' allegations about Enron, the prior "experience" referenced in *McCall* was an investigation and settlement for the *same type* of questionable billing practices before the Sixth Circuit.[71] Plaintiffs have not shown how involvement with the Enron related scandals should have in any way put the director defendants on a heightened alert to problems in the subprime mortgage market. Additionally, the use of SIVs in the Enron related conduct would not serve to put the director defendants on any type of heightened notice to the unrelated use of SIVs in structuring transactions involving subprime securities.

The Complaint and plaintiffs' answering brief repeatedly make the conclusory allegation that the defendants have breached their duty of oversight, but nowhere do plaintiffs adequately explain what the director defendants actually did or failed to do that would constitute such a violation. Even while admitting that Citigroup had a risk monitoring system in place, plaintiffs seem to conclude that, because the director defendants (and the ARM Committee members in particular) were charged with monitoring Citigroup's risk, then they must be found liable because Citigroup experienced losses as a result of exposure

---

67. *Id.* at 47.

68. 239 F.3d 808 (6th Cir.2001).

69. *Id.* at 819–24 (noting allegations of numerous financial irregularities in reports brought to the board's attention).

70. Pls.' Answering Br. at 48.

71. *See McCall,* 239 F.3d at 821.

to the subprime mortgage market. The only factual support plaintiffs provide for this conclusion are "red flags" that actually amount to nothing more than signs of continuing deterioration in the subprime mortgage market. These types of conclusory allegations are exactly the kinds of allegations that do not state a claim for relief under *Caremark*.

To recognize such claims under a theory of director oversight liability would undermine the long established protections of the business judgment rule. It is well established that the mere fact that a company takes on business risk and suffers losses—even catastrophic losses—does not evidence misconduct, and without more, is not a basis for personal director liability.[72] That there were signs in the market that reflected worsening conditions and suggested that conditions may deteriorate even further is not an invitation for this Court to disregard the presumptions of the business judgment rule and conclude that the directors are liable because they did not properly evaluate business risk. What plaintiffs are asking the Court to conclude from the presence of these "red flags" is that the directors failed to see the extent of Citigroup's business risk and therefore made a "wrong" business decision by allowing Citigroup to be exposed to the subprime mortgage market.

This Court's recent decision in *American International Group, Inc. Consolidated Derivative Litigation*[73] demonstrates the stark contrast between the allegations here and allegations that are sufficient to survive a motion to dismiss. In *AIG*, the Court faced a motion to dismiss a complaint that included "well-pled allegations of pervasive, diverse, and substantial financial fraud involving managers at the highest levels of AIG."[74] In concluding that the complaint stated a claim for relief under Rule 12(b)(6),[75] the Court held that the factual allegations in the complaint were sufficient to support an inference that AIG executives running those divisions knew of and approved much of the wrongdoing. The Court reasoned that huge fraudulent schemes were unlikely to be perpetrated without the knowledge of the executive in charge of that division of the company.[76] Unlike the allegations in this case, the defendants in *AIG* allegedly failed to exercise reasonable oversight over pervasive *fraudulent* and *criminal* conduct. Indeed, the Court in *AIG* even stated that the complaint there supported the assertion that top AIG officials were leading a "criminal organization" and that "[t]he diversity, pervasiveness, and materiality of the alleged financial wrongdoing at AIG is extraordinary."[77]

Contrast the *AIG* claims with the claims in this case. Here, plaintiffs argue that the Complaint supports the reasonable conclusion that the director defendants acted in bad faith by failing to see the warning signs of a deterioration in the subprime mortgage market and failing to

72. *See Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 (Del.Ch.1996) ("The business outcome of an investment project that is unaffected by director self-interest or bad faith, cannot itself be an occasion for director liability.") (footnote omitted).

73. 965 A.2d 763, 2009 WL 366613 (Del.Ch. 2009).

74. *Id.* at 776, 2009 WL 366613 at *3.

75. It is also significant that the *AIG* Court was analyzing the Complaint under the plaintiff-friendly standard of Rule 12(b)(6), rather than the particularized pleading standard of Rule 23.1.

76. *AIG*, 965 A.2d at 797–98, 2009 WL 366613 at *22.

77. *Id.* at 799, 2009 WL 366613 at *23.

cause Citigroup to change its investment policy to limit its exposure to the subprime market. Director oversight duties are designed to ensure reasonable reporting and information systems exist that would allow directors to know about and prevent wrongdoing that could cause losses for the Company. There are significant differences between failing to oversee employee fraudulent or criminal conduct and failing to recognize the extent of a Company's business risk. Directors should, indeed must under Delaware law, ensure that reasonable information and reporting systems exist that would put them on notice of fraudulent or criminal conduct within the company. Such oversight programs allow directors to intervene and prevent frauds or other wrongdoing that could expose the company to risk of loss as a result of such conduct. While it may be tempting to say that directors have the same duties to monitor and oversee business risk, imposing *Caremark*-type duties on directors to monitor business risk is fundamentally different. Citigroup was in the business of taking on and managing investment and other business risks. To impose oversight liability on directors for failure to monitor "excessive" risk would involve courts in conducting hindsight evaluations of decisions at the heart of the business judgment of directors. Oversight duties under Delaware law are not designed to subject directors, even expert directors, to *personal liability* for failure to predict the future and to properly evaluate business risk.[78]

Instead of alleging facts that could demonstrate bad faith on the part of the directors, by presenting the Court with the so called "red flags," plaintiffs are inviting the Court to engage in the exact kind of judicial second guessing that is proscribed by the business judgment rule. In any business decision that turns out poorly there will likely be signs that one could point to and argue are evidence that the decision was wrong. Indeed, it is tempting in a case with such staggering losses for one to think that they could have made the "right" decision if they had been in the directors' position. This temptation, however, is one of the reasons for the presumption against an objective review of business decisions by judges, a presumption that is no less applicable when the losses to the Company are large.

### 2. *Plaintiffs' Disclosure Allegations*

■ Plaintiffs argue that demand is excused as futile because the director defendants face a substantial likelihood of personal liability for violating their duty of disclosure and would therefore be unable to exercise independent and disinterested business judgment in responding to a demand.[79] Plaintiffs allege that the director

**78.** If defendants had been able to predict the extent of the problems in the subprime mortgage market, then they would not only have been able to avoid losses, but presumably would have been able to make significant gains for Citigroup by taking positions that would have produced a return when the value of subprime securities dropped. Compl. ¶ 78. Query: if the Court were to adopt plaintiffs' theory of the case—that the defendants are personally liable for their failure to see the problems in the subprime mortgage market and Citigroup's exposure to them—then could not a plaintiff succeed on a theory that a director was personally liable for failure to predict the extent of the subprime mortgage crisis and profit from it, even if the company was not exposed to losses from the subprime mortgage market? If directors are going to be held liable for losses for failing to accurately predict market events, then why not hold them liable for failing to profit by predicting market events that, in hindsight, the director should have seen because of certain red (or green?) flags? If one expects director prescience in one direction, why not the other?

**79.** Plaintiffs argue that the disclosure claims relate to actions taken by the board and are therefore subject to the *Aronson* standard.

defendants violated their duty of disclosure by, among other things, failing to properly disclose the value of certain financial instruments,[80] placing underperforming assets in SIVs without fully disclosing the risk that Citigroup might have to bring the assets back onto its balance sheet,[81] and failing to properly account for guarantees, specifically the liquidity puts that allowed buyers of CDOs to sell the products back to Citigroup at face value.[82] Plaintiffs argue that the "red flags" alleged in the Complaint lead to a reasonable inference that the director defendants, and particularly the ARM Committee members, knew that certain disclosures regarding the Company's exposure to subprime assets were misleading.

 "[E]ven in the absence of a request for shareholder action, shareholders are entitled to honest communication from directors, given with complete candor and in good faith."[83] When there is no request for shareholder action, a shareholder plaintiff can demonstrate a breach of fiduciary duty by showing that the directors "*deliberately* misinform[ed] shareholders about the business of the corporation, either directly or by a public statement."[84] Citigroup's certificate of incorporation exculpates the director defendants from personal liability for violations of fiduciary duty except for, among other things, breaches of the duty of loyalty and acts or omissions not in good faith or that involve intentional misconduct or knowing violation of law. Thus, to show a substantial likelihood of liability that would excuse demand, plaintiffs must plead particularized factual allegations that "support the inference that the disclosure violation was made in bad faith, knowingly or intentionally."[85] Additionally, directors of Delaware corporations are fully protected in relying in good faith on the reports of officers and experts.[86]

The factual allegations in the Complaint are not sufficient to allow me to reasonably conclude that the director defendants face a substantial likelihood of liability that would prevent them from impartially considering a demand. This is so for at least three reasons. First, plaintiffs fail to allege with sufficient specificity the actual misstatements or omissions that constituted a violation of the board's duty of

---

Plaintiffs request, however, that the Court review demand futility under the substantial likelihood of liability standard and present their demand futility arguments under that standard.

80. Compl. ¶ 172.

81. *Id.* at ¶ 70.

82. *Id.* at ¶¶ 163–65.

83. *In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 990 (Del.Ch.2007).

84. *Malone v. Brincat*, 722 A.2d 5, 14 (Del. 1998) (emphasis added); *see infoUSA*, 953 A.2d at 990 (finding that directors violate their fiduciary duties "where it can be shown that the directors involved issued their communication with the knowledge that it was deceptive or incomplete").

85. *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 915 (Del.Ch. Aug. 20, 1999).

86. 8 *Del. C.* § 141(e) ("A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation."); *see Brehm*, 746 A.2d at 261.

disclosure.[87] The Complaint merely alleges, in general and conclusory terms, that the director defendants did not adequately disclose certain risks faced by the Company—for example, the risks posed by Citigroup's SIVs and the liquidity puts that allowed purchasers of CDOs to sell the instruments back to Citigroup at face value.[88] The Complaint does not identify any actual disclosure that was misleading or any statement that was made misleading as a result of an omission of a material fact. Instead, plaintiffs allege, for instance, that the Citigroup board "abdicated its fiduciary duties by not disclosing information on the fair value of VIEs, CDOs and SIVs"[89] and that "the ARM Committee abdicated its fiduciary duties ... to ensure the integrity of Citigroup's financial statements and financial reporting process, including earnings press releases and financial information provided to analysts and rating agencies."[90]

In other words, the disclosure allegations in the complaint do not meet the stringent standard of factual particularity required under Rule 23.1. They fail to allege with particularity which disclosures were misleading, when the Company was obligated to make disclosures, what specifically the Company was obligated to disclose, and how the Company failed to do so.[91] This information is critical because to establish a threat of director liability

87. *See Pfeffer v. Redstone,* 965 A.2d 676, 687 2009 WL 188887, at *6 (Del. 2009) ("Although there is 'no reason to depart from the general pleading rules when alleging duty of disclosure violations,' 'it is inherent in disclosure cases that the misstated or omitted facts be identified and that the pleading not be merely conclusory.'") (quoting *Loudon v. Archer–Daniels–Midland Co.,* 700 A.2d 135, 140 (Del.1997)).

88. Compl. ¶¶ 160–73. To be fair, plaintiffs point to some specific statements in the Complaint. For example, paragraph 82 of the Complaint alleges that the director defendants "caused or allowed" Citigroup to issue a press release that highlighted, among other things, "positive trends from Citigroup's strategic actions." Paragraphs 88 and 99 of the Complaint allege that the director defendants "caused" Citigroup to issue press releases that stated that the Company had "generated strong momentum this quarter" and that cited decreasing credit costs "reflecting a stable global credit environment." Even these allegations, however, fail to meet the strict pleading requirements under Rule 23.1. Pleading that the director defendants "caused" or "caused or allowed" the Company to issue certain statements is not sufficient particularized pleading to excuse demand under Rule 23.1. It is unclear from such allegations how the board was actually involved in creating or approving the statements, factual details that are crucial to determining whether demand on the board of directors would have been excused as futile. These allegations also fail for the other reasons described below, most notably because the Complaint fails to adequately plead facts reasonably suggesting that the director defendants made disclosures with knowledge that they were false or misleading or in bad faith.

89. Compl. ¶ 172.

90. *Id.* at ¶ 161.

91. The closest plaintiffs come to alleging a specific disclosure violation are the allegations that the Company failed to disclosure the existence of the liquidity puts until November 2007 and failed to disclose that the Company may have to take certain assets held by SIVs back onto its balance sheet. Compl. ¶¶ 70, 165–69. Even these claims, however, are vague and relatively light on the details of what the Company was required to disclose, when it was required to disclose it, and how its failure to do so would constitute a violation of the duty of disclosure. In any event, as discussed below, these claims fail to plead demand futility because plaintiffs have (1) failed to sufficiently allege facts showing that the director defendants were involved in preparing (or were otherwise responsible for) the alleged misleading disclosures and (2) failed to allege facts that would lead to a reasonable inference that the director defendants made any false or misleading statements or omissions knowingly or in bad faith.

based on a disclosure violation, plaintiffs must plead facts that show that the violation was made knowingly or in bad faith, a showing that requires allegations regarding what the directors knew and when. Without knowing when and how the alleged disclosure violations occurred, it is impossible to determine if the directors made the misstatements or omissions knowingly or in bad faith. As a result, the disclosure allegations in the complaint do not meet the stringent requirements of factual particularity under Rule 23.1.

Second, the Complaint does not contain specific factual allegations that reasonably suggest sufficient board involvement in the preparation of the disclosures that would allow me to reasonably conclude that the director defendants face a substantial likelihood of personal liability.[92] Plaintiffs do not allege facts suggesting that the director defendants prepared the financial statements or that they were directly responsible for the misstatements or omissions. The Complaint merely alleges that Citigroup's financial statements contained false statements and material omissions and that the director defendants reviewed the financial statements pursuant to their responsibilities under the ARM Committee charter. Thus, I am unable to reasonably conclude that the director defendants face a substantial likelihood of liability.

Third, and perhaps most importantly, the Complaint does not sufficiently allege that the director defendants had knowledge that any disclosures or omissions were false or misleading or that the director defendants acted in bad faith in not adequately informing themselves.[93] Plaintiffs have not alleged particular facts showing that the director defendants were even aware of any misstatements or omissions. Instead, plaintiffs conclusorily assert that the members of the ARM Committee, as financial experts, knew the relevant accounting standards, knew or should have known the extent of the Company's exposure to the subprime mortgage market, and are therefore responsible for alleged false statements or omissions in Citigroup's financial statements.[94] Instead of providing factual allegations regarding the knowledge or bad faith of the individual director defendants, the Complaint makes broad group allegations about the director defendants or the members of the ARM Committee.[95] A determination of whether the alleged misleading statements or omissions were made with knowledge or in bad faith requires an analysis of the state of mind of the individual director defendants, and plaintiffs have not made specific factual allegations that would allow for such an inquiry. Plaintiffs' alleged "red flags," which amount to nothing more than indications of worsening economic conditions, do not support a reasonable inference that the

---

**92.** *See Wood*, 953 A.2d at 142 ("The Board's execution of [the company's] financial reports, without more, is insufficient to create an inference that the directors had actual or constructive notice of any illegality.").

**93.** *See Pfeffer*, 965 A.2d 676, at 687, 2009 WL 188887, at *6 ("When pleading a breach of fiduciary duty based on the ... Directors' knowledge, [the plaintiff] must, at a minimum, offer 'well-pleaded facts from which it can be reasonably inferred that this 'something' was knowable and that the defendant was in a position to know it.'") (quoting

*IOTEX Commc'ns, Inc. v. Defries*, C.A. No. 15817, 1998 WL 914265, at *4 (Del.Ch. Dec. 21, 1998)).

**94.** Compl. ¶ 191.

**95.** *See AIG*, 965 A.2d at 763, 2009 WL 366613 at *21 ("Although these allegations are varied and far reaching, ... these allegations are supported by the pled facts. For starters, the Complaint is not laden with such accusations against the D & O Defendants as a group; these group accusations are used sparingly.").

director defendants approved or disseminated the financial disclosures knowingly or in bad faith. Merely alleging that there were signs of problems in the subprime mortgage market is not sufficient to show that the director defendants knew that Citigroup's disclosures were false or misleading. The allegations are not sufficiently specific to Citigroup or to the director defendants to meet the strict pleading requirements of Rule 23.1.

Although the members of the ARM Committee were charged with reviewing and ensuring the accuracy of Citigroup's financial statements under the ARM Committee charter, director liability is not measured by the aspirational standard established by the internal documents detailing a company's oversight system. Under our law, to establish liability for misstatements when the board is not seeking shareholder action, shareholder plaintiffs must show that the misstatement was made knowingly or in bad faith. Additionally, even board members who are experts are fully protected under § 141(e) in relying in good faith on the opinions and statements of the corporation's officers and employees who were responsible for preparing the company's financial statements. Plaintiffs' allegations that the members of the ARM Committee were financial experts and were aware of the "red flags" alleged in the Complaint do not support a reasonable inference that the director defendants' reliance on the officers and experts who prepared the financial statements was not in good faith.

Even accepting plaintiffs' allegations as true, the Complaint fails to plead with particularity facts that would lead to the reasonable inference that the director defendants made or allowed to be made any false statements or material omissions with knowledge or in bad faith. Accordingly, plaintiffs have failed to plead with particularity facts creating a reasonable doubt that the director defendants face a threat of personal liability that would render them incapable of exercising independent and disinterested business judgment in responding to a demand. Plaintiffs' disclosure claims are therefore dismissed pursuant to Rule 23.1

## C. Demand Futility Allegations Regarding Plaintiffs' Waste Claims

Count III of the Complaint alleges that certain of the defendants are liable for waste for (1) approving the Letter Agreement dated November 4, 2007 between Citigroup and defendant Prince; (2) allowing the Company to purchase over $2.7 billion in subprime loans from Accredited Home Lenders at one of its "fire sales" in March 2007 and from Ameriquest Home Mortgage in September 2007; (3) approving the buyback of over $645 million worth of the Company's shares at artificially inflated prices pursuant to a repurchase program in early 2007; and (4) allowing the Company to invest in SIVs that were unable to pay off maturing debt.[96]

---

**96.** Plaintiffs do not adequately plead that the asset purchases or the investments in SIVs were the result of board action rather than inaction. To establish demand futility in the absence of director action the Complaint would have to plead facts sufficient to create a reasonable doubt that the director defendants could exercise disinterested and independent business judgment in responding to a demand. It is not clear to the Court on exactly what theory plaintiffs believe that demand is excused for these allegations. Pls.' Answering Br. at 56 nn. 45–46. In any event, the Complaint does not properly allege demand futility as to these claims because it does not create a reasonable doubt that the director defendants would be unable to exercise disinterested and independent business judgment in responding to a demand. First, because plaintiffs have failed to adequately plead that the challenged asset purchases or investments in SIVs were the result of board

Demand futility is analyzed under *Aronson* when plaintiffs have challenged board action or approval of a transaction. With regard to the claims based on the approval of the Letter Agreement and the repurchase of Citigroup stock, plaintiffs do not argue that a majority of the director defendants were not disinterested and independent. Rather, plaintiffs argue that demand is excused under the second prong of the *Aronson* analysis, which requires that the plaintiffs plead particularized factual allegations that raise a reasonable doubt at to whether "the challenged transaction was otherwise the product of a valid exercise of business judgment." [97]

 Delaware law provides stringent requirements for a plaintiff to state a claim for corporate waste, and to excuse demand on grounds of waste the Complaint must allege particularized facts that lead to a reasonable inference that the

director defendants authorized "an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." [98] The test to show corporate waste is difficult for any plaintiff to meet; indeed, "[t]o prevail on a waste claim … the plaintiff must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests." [99]

### 1. Approval of the Stock Repurchase Program

 Plaintiffs' claim for waste for the board's approval of the stock repurchase program falls far short of satisfying the standard for demand futility. Plaintiffs allege that "in spite of its prior buybacks below $50 per share and in spite of the

---

action, the director defendants cannot possibly face a substantial likelihood of personal liability for these transactions. *See Highland Legacy Ltd. v. Singer*, C.A. No. 1566–N, 2006 WL 741939, at *7 (Del.Ch. Mar. 17, 2006) ("To excuse demand on the grounds of waste, the complaint must allege particularized facts sufficient to create a reasonable doubt that the *board authorized action on the corporation's behalf* on terms that no person of ordinary, sound business judgment could conclude represents a fair exchange.") (emphasis added).

Second, and in the alternative, the director defendants do not face a substantial likelihood of personal liability for these claims because the Complaint is devoid of any allegation that would lead to the conclusion that allowing the Company to purchase these assets or invest in the SIVs constituted bad faith conduct by the director defendants. For similar reasons as I explained with regard to the *Caremark* claims, the alleged "red flags" are not sufficient to support an inference that the director defendants did not act in good faith by not preventing those charged with making business decisions for the Company from purchasing subprime assets or investing in the SIVs. That these investments turned out poor-

ly for the Company is not evidence of bad faith conduct. The decision to purchase certain investment assets, or to allow others in the Company to purchase certain investment assets, is the essence of the business judgment of directors and officers. Additionally, the Complaint makes no factual allegation that the decision to invest in the subprime assets or the SIVs was of no value to the Company. As I have said numerous times now, judges are in no position to second guess well-informed business decisions made in good faith, and the allegations in the Complaint are not sufficient to suggest that the directors knowingly or in bad faith disregarded their duty to monitor. Accordingly, the claims for waste for the asset purchases and the investments in SIVs fail to properly plead demand futility pursuant to Rule 23.1.

**97.** *Aronson*, 473 A.2d at 814.

**98.** *Brehm*, 746 A.2d at 263 (quoting *In re The Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 362 (Del.Ch.1998)); *see Highland*, 2006 WL 741939, at *7.

**99.** *White v. Panic*, 783 A.2d 543, 554 n. 36 (Del.2001).

Company's expanding losses and declining stock price, Citigroup repurchased 12.1 million shares during the first quarter of 2007 at an average price of $53.37."[100] Plaintiffs then claim that at the time the buyback of Citigroup stock was halted, the stock was trading at $46 per share. Plaintiffs conclude that the director defendants "authorized and did not suspend the Company's share repurchase program, which resulted in the Company's buying back over $645 million worth of the Company's shares at artificially inflated prices."[101]

Specifically, plaintiffs argue the following:

> As set forth in the Complaint, the Director Defendants recklessly failed to consider and account for the subprime lending crisis, the Company's exposure to falling CDO values by virtue of its liquidity puts, and the collective impact on the Company's billions in warehoused subprime loans. Consequently, the Director Defendants are not entitled to the presumption of business judgment and are liable for waste for approving the buyback of over $645 million worth of the Company's shares at artificially inflated prices pursuant to the repurchase program. Under the circumstances, the repurchase program should have been suspended, and would have saved the Company hundreds of millions of dollars. The magnitude of the Director Defendants' utter failure to properly inform themselves of the Company's dire straits has only been highlighted by the Company's recent historically low share prices.[102]

To say the least, this argument demonstrates that the Complaint utterly fails to state a claim for waste for the board's approval of the stock repurchase. Plaintiffs seem to completely ignore the standard governing corporate waste under Delaware law—a standard that requires that plaintiffs plead facts overcoming the presumption of good faith by showing "an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration."[103] Plaintiffs attempted to meet this standard by alleging that the director defendants approved a repurchase of Citigroup stock *at the market price.* Other than a conclusory allegation, plaintiffs have alleged nothing that would explain how buying stock at the market price—the price at which presumably ordinary and rational businesspeople were trading the stock— could possibly be so one sided that no reasonable and ordinary business person would consider it adequate consideration. Again, plaintiffs merely allege "red flags" and then conclude that the board is liable for waste because Citigroup repurchased its stock before the stock dropped in price as a result of Citigroup's losses from exposure to the subprime market. In short, the Complaint states no particularized facts that would lead to any inference that the board's approval of the stock repurchase constituted corporate waste. Accordingly, plaintiffs have not adequately alleged demand futility as to this claim pursuant to Rule 23.1.

### 2. *Approval of the Letter Agreement*

 Plaintiffs allege that the board's approval of the November 4, 2007 letter agreement constituted corporate waste. Because approval of the letter was board action, demand is evaluated under the *Ar-*

---

**100.** Pls.' Answering Br. at 61.

**101.** *Id.*

**102.** *Id.* (citation omitted).

**103.** *Brehm,* 746 A.2d at 263 (quoting *Disney,* 731 A.2d at 362).

*onson* standard. Plaintiffs claim that demand is excused under the second prong of *Aronson* because the particularized factual allegations in the Complaint raise a reasonable doubt as to whether the approval was "the product of a valid exercise of business judgment." [104]

The directors of a Delaware corporation have the authority and broad discretion to make executive compensation decisions. The standard under which the Court evaluates a waste claim is whether there was "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." [105] It is also well settled in our law, however, that the discretion of directors in setting executive compensation is not unlimited. Indeed, the Delaware Supreme Court was clear when it stated that "there is an outer limit" to the board's discretion to set executive compensation, "at which point a decision of the directors on executive compensation is so disproportionately large as to be unconscionable and constitute waste." [106]

According to plaintiffs' allegations, the November 4, 2007 letter agreement provides that Prince will receive $68 million upon his departure from Citigroup, including bonus, salary, and accumulated stockholdings. [107] Additionally, the letter agreement provides that Prince will receive from Citigroup an office, an administrative assistant, and a car and driver for the lesser of five years or until he commences full time employment with another employer. [108] Plaintiffs allege that this compensation package constituted waste and met the "so one sided" standard because, in part, the Company paid the multi-million dollar compensation package to a departing CEO whose failures as CEO were allegedly responsible, in part, for billions of dollars of losses at Citigroup. In exchange for the multi-million dollar benefits and perquisites package provided for in the letter agreement, the letter agreement contemplated that Prince would sign a non-compete agreement, a non-disparagement agreement, a non-solicitation agreement, and a release of claims against the Company. [109] Even considering the text of the letter agreement, I am left with very little information regarding (1) how much additional compensation Prince actually received as a result of the letter agreement and (2) the real value, if any, of the various promises given by Prince. Without more information and taking, as I am required, plaintiffs' well pleaded allegations as true, there is a reasonable doubt as to whether the letter agreement meets the admittedly stringent "so one sided" standard or whether the letter agreement awarded compensation that is beyond the "outer limit" described by the Delaware Supreme Court. Accordingly, the Complaint has adequately alleged, pursuant to Rule 23.1, that demand is excused with regard to the waste claim based on the board's approval of Prince's compensation under the letter agreement.

104. *Aronson*, 473 A.2d at 814.

105. *Brehm*, 746 A.2d at 263.

106. *Id.* at 262 n. 56 (citing *Saxe v. Brady*, 184 A.2d 602, 610 (Del.Ch.1962)); *see Grimes v. Donald*, 673 A.2d 1207, 1215 (Del.1996).

107. Compl. ¶ 122; Pls.' Answering Br. at 57–58.

108. Compl. ¶ 124.

109. The Court takes judicial notice of the letter agreement, a publicly available document that was integral to plaintiffs' waste claim and incorporated into the Complaint. *See Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del.1996).

## D. The Motion to Dismiss under Rule 12(b)(6)

The only claim as to which plaintiffs adequately pleaded demand futility is the claim for corporate waste for the board's approval of the letter agreement granting a multi-million dollar compensation package to Prince upon his departure as Citigroup's CEO. When considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court is required to accept as true all well-pleaded factual allegations in the complaint and make all reasonable inferences that logically flow from the face of the complaint in the plaintiff's favor.[110] The Court can only dismiss the complaint if it "determines with 'reasonable certainty' that the plaintiff could prevail on no set of facts that may be inferred from the well-pleaded allegations in the complaint."[111]

The standard for pleading demand futility under Rule 23.1 is more stringent than the standard under Rule 12(b)(6), and "a complaint that survives a motion to dismiss pursuant to Rule 23.1 will also survive a 12(b)(6) motion to dismiss, assuming that it otherwise contains sufficient facts to state a cognizable claim."[112] Accordingly, for the same reasons stated in the demand futility analysis, the Complaint contains well-pleaded factual allegations regarding the claim for waste for the approval of the Prince letter agreement that make it impossible for me to conclude with reasonable certainty that the plaintiff could prevail on no set of facts that could be reasonably inferred from the allegations in the Complaint.[113]

## IV. CONCLUSION

Citigroup has suffered staggering losses, in part, as a result of the recent problems in the United States economy, particularly those in the subprime mortgage market. It is understandable that investors, and others, want to find someone to hold responsible for these losses, and it is often difficult to distinguish between a desire to blame *someone* and a desire to force those responsible to account for their wrongdoing. Our law, fortunately, provides guidance for precisely these situations in the form of doctrines governing the duties owed by officers and directors of Delaware corporations. This law has been refined over hundreds of years, which no doubt included many crises, and we must not let our desire to blame someone for our losses make us lose sight of the purpose of our law. Ultimately, the discretion granted directors and managers allows them to maximize shareholder value in the long term by taking risks without the debilitating fear that they will be held personally liable if the company experiences losses. This doctrine also means, however, that when the company suffers losses, shareholders may not be able to hold the directors personally liable.

For the foregoing reasons, the motion to dismiss or stay in favor of the New York Action is denied. Defendants' motion to dismiss is denied as to the claim in Count III of the Complaint for waste for approval

---

110. *See Malpiede v. Townson*, 780 A.2d 1075, 1082–83 (Del.2001).

111. *Id.*

112. *McPadden v. Sidhu*, C.A. No. 3310–CC, 2008 WL 4017052, at *7 (Del.Ch. Aug. 29, 2008).

113. I am also not convinced that defendants would be exculpated under Citigroup's certificate for committing waste. *See In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749 (Del.Ch.2005) ("The Delaware Supreme Court has implicitly held that committing waste is an act of bad faith.") (citing *White v. Panic*, 783 A.2d 543, 553–55 (Del.2001)).

of the November 4, 2007 Prince letter agreement. All other claims in the complaint are dismissed for failure to adequately plead demand futility pursuant to Court of Chancery Rule 23.1.

An Order has been entered consistent with this Opinion.

## ORDER

For the reasons set forth in this Court's Opinion entered in this case on this date, it is

ORDERED:

1. The motion to dismiss or stay in favor of the New York Action is denied;

2. Counts I, II, and IV of the Consolidated Second Amended Derivative Complaint are hereby dismissed pursuant to Court of Chancery Rule 23.1; and

3. Defendants' motion to dismiss is denied as to the claim in Count III of the Complaint for waste for the board's approval of the November 4, 2007 letter agreement between Citigroup, Inc. and defendant Charles Prince. All other claims in Count III of the Complaint are hereby dismissed pursuant to Court of Chancery Rule 23.1.

