**IN RE: POLYCOM, INC.
Derivative Litigation**

**This Order Relates To: All Actions**

**Case No. 13–CV–03880 SC**

United States District Court,
N.D. California.

Signed January 13, 2015

Nathan R. Hamler, Shawn Eric Fields, Frank James Johnson, Johnson & Weaver, LLP, San Diego, CA, for Plaintiffs.

Paul T. Friedman, Philip T. Besirof, Morrison & Foerster LLP, San Francisco, CA, Keith E. Eggleton, Kelley Moohr Kinney, Wilson Sonsini Goodrich & Rosati A Professional Corporation, Palo Alto, CA, for Defendants.

### ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS

Samuel Conti, UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

Now before the Court are motions to dismiss Plaintiffs' Verified Consolidated First Amended Shareholder Derivative Complaint, ECF No. 47 ("Compl."). The first motion was filed by Polycom, Inc. and five members of its Board of Directors, Betsy S. Atkins, John A. Kelley, D. Scott Mercer, William A. Owens, and Kevin T. Parker,[1] (collectively, "Polycom"). ECF No. 48 ("Polycom Mot."). The second motion was filed by Polycom's former CEO and Defendant Andrew Miller. ECF No. 51 ("Miller Mot."). The motions are fully briefed,[2] and appropriate for disposition without oral argument under Civil Local Rule 7–1(b). For the reasons set forth below, the motions are GRANTED IN PART and DENIED IN PART.

---

1. The Court will refer to the Board Members collectively as simply "the Board" or "the Board Members." In addition to serving on the board, three individual defendants, Kelley, Mercer, and Parker served on Polycom's Audit Committee. The Court will refer to these individuals specifically as the "Audit Committee."

2. ECF Nos. 59 ("Opp'n"), 60 ("Polycom Reply"), 61 ("Miller Reply").

## II. BACKGROUND

This is a shareholder derivative suit against Polycom, a San Jose-based provider of video and telecommunication systems, arising out of allegations of misconduct by Polycom's CEO, Andrew Miller. Miller resigned after an investigation by Polycom's Audit Committee, made up of Kelley, Mercer, and Parker, found problems with Miller's expense reimbursements.

During Miller's tenure as CEO, he allegedly claimed reimbursements for numerous inappropriate personal expenses. According to a confidential witness for Plaintiffs, this behavior was well-known within Polycom, although the parties disagree about the extent and import of any such knowledge. In any event, after an investigation, Miller and Polycom entered into a separation agreement. Under the separation agreement, Miller agreed to resign, release compensation and employment-related claims against Polycom, and provide continued assistance through a transition period in exchange for a severance package. Following Miller's resignation, Polycom stated in a press release that "[t]he amounts [of the inappropriate personal expenses] did not have a material impact on the Company's current or previously reported financial statements for any period, nor did they involve any other employees." ECF No. 50 ("Rucker Decl.") Ex. A ("Form 8–K").[3]

Shortly thereafter, Plaintiffs filed derivative complaints alleging breaches of fiduciary duty, unjust enrichment, and corporate waste against Miller and the Director Defendants. In Plaintiffs' view, the Board made false statements (or allowed such statements to be made by others) about the adequacy of internal controls on expense reimbursement, failed to implement and apply Polycom's expense reimbursement policies, unjustifiably gave Miller a 'golden parachute' without adequately assessing his conduct, granted Miller a "unique position of power over the Company," in which the directors were "beholden" to him, and repurchased stock at prices artificially inflated by misleading statements about internal controls and compliance. *See* Compl. ¶¶ 31, 107–08, 112, 127, 142–51, 169.

Prior to filing suit, Plaintiffs did not demand Polycom's Board pursue these claims directly on Polycom's behalf, arguing that doing so would have been futile. At the time the initial complaint was filed, Polycom's Board had five members, the Board Members. Four of those, Atkins, Kelley, Mercer, and Owens, have always been outside directors. The fifth, Parker, became interim-CEO after Miller's resignation.

Now Defendants move to dismiss, arguing that Plaintiffs' failure to make a pre-suit demand on the Board cannot be excused. In the alternative, they suggest that the complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(6). Plaintiffs oppose.

## III. LEGAL STANDARD

### A. Derivative Suits Generally

Generally speaking, a corporation, not its shareholders, has the sole right to pursue litigation for injuries suffered by the corporation. *See Potter v. Hughes*, 546 F.3d 1051, 1058 (9th Cir. 2008). A shareholder derivative suit is one

---

**3.** This document and other SEC filings are the subject of Requests for Judicial Notice, ECF Nos. 49, 52. Courts often take judicial notice of such filings. *See In re Netflix, Inc., Sec. Litig.*, 923 F.Supp.2d 1214, 1218 n. 1

(N.D.Cal.2013). Because these documents "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b), the requests are GRANTED.

of the exceptions to this general rule. "The derivative form of action permits an individual shareholder to bring 'suit to enforce a *corporate* cause of action against officers, directors, and third parties.'" *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (quoting *Ross v. Bernhard*, 396 U.S. 531, 534, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970)) (emphasis in original).

 "The theory in a derivative suit is that a corporation's board has been so faithless to investors' interests that investors must be allowed to pursue a claim in the corporation's name." *Robert F. Booth Tr. v. Crowley*, 687 F.3d 314, 316–17 (7th Cir.2012). This is a serious remedy, and as a result, courts require a shareholder 'demand' the corporation bring the claim directly or show that demand should be excused because the board is biased or demand is otherwise futile. *Kamen*, 500 U.S. at 96, 111 S.Ct. 1711.

### B. *Pleading Standard Under Rule 23.1*

 Federal law requires that a shareholder derivative complaint describe "with particularity" "any effort by the plaintiff to obtain the desired action from the directors and . . . the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3)(A)–(B). On a motion to dismiss under Rule 23.1 the Court must accept as true well-pleaded factual allegations in the complaint. *In re Cendent Corp. Deriv. Action Litig.*, 189 F.R.D. 117, 127 (D.N.J.1999).

### C. *Demand Futility Under Delaware Law*

 Because Polycom is incorporated in Delaware, Delaware law supplies the standard for assessing whether the failure to make demand on the board can be excused. *Kamen*, 500 U.S. at 108–09, 111 S.Ct. 1711; *see also In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 989–90 (9th Cir.1999), *abrogated on other grounds, S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir.2008). The demand requirement is "designed to give a corporation the opportunity to rectify an alleged wrong without litigation, and to control any litigation which does arise." *Aronson v. Lewis*, 473 A.2d 805, 809 (Del.1984), *overruled in part on other grounds, Brehm v. Eisner*, 746 A.2d 244 (Del.2000).

 In order to demonstrate that demand would have been futile, there are two relevant tests. The first, the *Aronson* test, applies when plaintiffs challenge a board decision. *In re Openwave Sys. Inc. S'holder Derivative Litig.*, 503 F.Supp.2d 1341, 1345 (N.D.Cal.2007). To satisfy the *Aronson* test, plaintiffs must show "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [, or] (2) the challenged transaction was otherwise the product of valid exercise of business judgment." *Aronson*, 473 A.2d at 814. The *Aronson* test is disjunctive, so "[i]f a derivative plaintiff can demonstrate a reasonable doubt as to the first or second prong of the *Aronson* test, then he has demonstrated that demand would have been futile." *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del.Ch.1995).

 The second test, the *Rales* test, applies "where the board that would be considering the demand did not make a business decision which is being challenged. . . ." *Rales v. Blasband*, 634 A.2d 927, 933 (Del.1993). Under those circumstances, the second prong of *Aronson* is inapplicable, and the plaintiff must plead particularized facts that there is a reasonable doubt that a board majority could exercise independent and disinterested business judgment in responding to a demand. *See Rales v. Blasband*, 634 A.2d 927, 934 (Del.1993).

Under both these tests, reasonable doubt is "akin to the concept that the stockholder has a 'reasonable belief' that the board. lacks independence." *Grimes v. Donald,* 673 A.2d 1207, 1217 n. 17 (Del.1996), *overruled on other grounds, Brehm,* 746 A.2d 244. The business judgment rule is the "presumption that directors making a business decision, not involving self-interest, act on an informed basis, in good faith, and in the honest belief that their actions are in the corporation's best interest." *Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988), *overruled in part on other grounds, Brehm,* 746 A.2d 244.

## IV. DISCUSSION

Plaintiffs make four claims. First, Plaintiffs claim that the board failed to adequately oversee Polycom's auditing and accounting controls. Second, Plaintiffs argue that Polycom issued false and misleading financial statements. Third, Plaintiffs believe the separation agreement the board executed with Miller constitutes corporate waste and accorded excessive benefits. Finally, Plaintiffs challenge Polycom's stock repurchases. While "no single factor ... may itself be dispositive in any particular case," the Court must determine "whether the accumulation of all factors creates the reasonable doubt" that the board was independent and exercised independent and disinterested business judgment.

Plaintiffs' oversight and false and misleading statement claims are governed by the *Rales* test, while Plaintiffs' challenges to the separation agreement are governed by the *Aronson* test. *Compare In re Accuray, Inc. S'holder Derivative Litig.,* 757 F.Supp.2d 919, 926–30 (N.D.Cal.2010) (applying the *Rales* test to oversight claims), *with Zucker v. Andreessen,* No. 6014–VCP, 2012 WL 2366448, at *6 (Del.Ch. June 21, 2012) (reviewing a severance agreement under the *Aronson* test). Because different tests apply to each claim, the Court examines each claim in isolation while remaining mindful of the requirement that the Court "determine whether the totality of Plaintiffs' allegations demonstrate a reasonable doubt about the Board's impartiality." *In re Bidz.com, Inc. Derivative Litig.,* 773 F.Supp.2d 844, 860 (C.D.Cal.2011) (citing *Harris v. Carter,* 582 A.2d 222, 229 (Del. Ch.1990)).

Under Polycom's certification of incorporation, Polycom limits director liability for breaches of fiduciary duty "[t]o the fullest extent permitted by the Delaware General Corporation Law...." Rucker Decl. Ex. D, Art. IX. This type of so-called exculpatory clause is authorized by Section 102(b)(7) of the Delaware General Corporation Law, and, contrary to Plaintiffs' assertions, is appropriately considered at the pleading stage in assessing demand futility.[4] *See In re Citigroup Inc. Shareholder Derivative Litigation,* 964 A.2d 106, 133 (Del.Ch.2009) (considering an exculpatory clause at the pleading stage in assessing demand futility). As a result, Plaintiffs must plead with particularity "substantial likelihood that [the Board

---

4. Plaintiffs are mistaken about whether the Court can consider the exculpatory clause on the motion to dismiss, because, as other courts have found, "the considerations informing an evaluation of demand futility are not necessarily the same as the appropriate considerations in evaluating whether a plaintiff has stated a claim." *Compare In re Maxwell Techs., Inc. Derivative Litig.,* No. 13–CV– 966–BEN RBB, 2014 WL 2212155, at *8 (S.D.Cal. May 27, 2014), *with In re Tower Air, Inc.,* 416 F.3d 229, 242 (3d Cir.2005), *and In re Brown Sch.,* 368 B.R. 394, 401 (Bankr. D.Del.2007). As a result, the Court takes judicial notice of Polycom's certificate of incorporation. *See Brown v. Moll,* No. C 09– 05881 SI, 2010 WL 2898324, at *1 n. 1, *4 (N.D.Cal. July 21, 2010) (taking judicial notice of a certificate of incorporation in assessing a motion to dismiss a derivative suit).

Members'] conduct falls outside the exemption." *In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268, 1270 (Del.Ch. 1995). For example, to plead a disclosure violation that falls outside the exculpatory clause, "plaintiffs must plead particularized factual allegations that 'support the inference that the disclosure violation was made in bad faith, knowingly, or intentionally.' " *Citigroup*, 964 A.2d at 132 (quoting *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 915 (Del.Ch. Aug. 20, 1999)).

Plaintiffs argue that the Board faces a substantial likelihood of personal liability for violations of the duties of loyalty and good faith[5] because the Board Members: (1) failed to oversee and ensure the effectiveness of Polycom's auditing and accounting controls, (2) made or caused to be made financial statements that were false and misleading in light of Miller's conduct and the alleged lack of adequate internal controls, and (3) approved Miller's separation agreement without adequately investigating Miller's misconduct.[6]

### A. *The Oversight Claim*

 Plaintiffs allege that demand is excused on their oversight claim because the board faces a substantial likelihood of personal liability for failing to adequately oversee Polycom's auditing and accounting controls. In support of this theory, Plaintiffs rely principally on a confidential witness ("CW") who was responsible for reviewing Miller's expense receipts and preparing his expense reports. During the CW's time at Polycom, he[7] reported to Jill Merken, Polycom's Vice President for Global Sales before allegedly being terminated for refusing to submit Miller's expense reports for including personal expenses. The CW stated that Miller's improper expenses were "common knowledge," most of Polycom's " 'executive assistants knew' and that multiple senior members of the accounting department" were aware as well. Compl. at ¶ 48. Further, according to the Complaint, "[t]his knowledge reached the highest levels of senior management," and the CW "once had a conversation with Laura Durr, who served as Polycom's Controller ... and who was appointed Interim Chief Financial Officer by the Director Defendants [in] ... 2014, about ... what Durr called Miller's 'unusual expense reports' " *Id.* at ¶ 49.

---

**5.** Perhaps recognizing that their claims for breaches of the duty of care are likely barred by the exculpatory clause, Plaintiffs appear not to press these claims in their opposition. *Compare* Compl. ¶¶ 127, 157–58, *with* Opp'n at 17 ("Director Defendants each breached their duties of loyalty and good faith and wasted Company assets...."), Rucker Decl. Ex. D, Art. IX (providing that "no director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty"), *and Guttman v. Huang*, 823 A.2d 492, 501 (Del.Ch.2003).

**6.** Plaintiffs' complaint also makes claims based on stock repurchases made at allegedly artificially inflated prices. In their motions to dismiss Defendants argue, among other things, that because there were no particularized facts demonstrating the Board's knowl-

edge that the stock price was artificially inflated and the repurchases were protected by the business judgment rule, it is not substantially likely the Board would face personal liability on these claims. *See Citigroup*, 964 A.2d at 137; *Silicon Graphics*, 183 F.3d at 990. In any event, while Plaintiffs mention the existence of these claims, they make no attempt to respond. "[I]n most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue." *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F.Supp.2d 1125, 1132 (C.D.Cal.2011) (quotation omitted). As a result, the Court need not address these allegations.

**7.** For obvious reasons, the CW's gender is not clear. For simplicity the Court will refer to the CW using male pronouns.

The chief problem with this allegation is Plaintiffs' failure to show that it is likely, let alone substantially likely, that the board would face liability on such a claim. As Delaware courts have made clear, oversight claims are extremely difficult to prove. *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del.Ch. 1996) (stating that an oversight claim is "possibly the most difficult theory in corporate law upon which a plaintiff might hope to win a judgment"). Directors cannot be held liable on an oversight claim unless "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone v. Ritter*, 911 A.2d 362, 370 (Del.2006) (emphasis in original).

Plaintiffs admit that throughout the relevant period Polycom had internal controls in place. The Complaint lays out the existence of Polycom's Audit Committee, the Committee's duties, and Polycom's Code of Business Ethics and Conduct, which provides that "Polycom funds must be used *only* for Polycom business purposes ... Polycom employees ... must not use Polycom funds for any personal purpose." Compl. ¶¶ 52–54; *see also id.* ¶¶ 117–21. Indeed, the confidential witness on whom Plaintiffs rely heavily in support of this claim stated that "Polycom had a tightly-monitored expense report approval process that easily would have uncovered Miller's ... conduct." *Id.* ¶ 43. Despite this, Plaintiffs argue at times that the Board "fail[ed] to exercise due care and diligence in the management and administration of the affairs of Polycom by failing to take reasonable steps to ensure that the Audit Committee implemented and assured compliance with adequate expense reimburse-

ment policies and procedures...." Opp'n at 17.

The problem with this allegation is it turns the *Caremark* inquiry on its head. Rather than plead particularized facts showing that the Board failed to implement or monitor Polycom's internal controls and that, as a result, the Company suffered some loss, Plaintiffs' complaint relies solely on the loss as proof that the internal controls or oversight were inadequate. *See, e.g.,* Compl. ¶ 144 (stating that the Board faces a substantial likelihood of liability for "unreasonably failing to prevent or expeditiously discover and stop the payment of improper expense reimbursements to Miller ...". This is insufficient because Delaware law does not allow Plaintiffs to simply presume "that employee wrongdoing would not occur if the directors performed their duty properly." *In re Baxter Int'l, Inc. S'holder Litig.*, 654 A.2d 1268, 1271 (Del.Ch.1995).

Furthermore, because internal controls were in place throughout the relevant period, Plaintiffs must plead particularized facts demonstrating that "the directors *knew* they were not discharging their fiduciary obligations or that the directors demonstrated a *conscious* disregard for their responsibilities such as by failing to act in the face of a known duty to act." *Citigroup*, 964 A.2d at 123 (emphasis in original). This is a "scienter-based standard...." *Desimone v. Barrows*, 924 A.2d 908, 935 (Del.Ch.2007).

Plaintiffs have not adequately pleaded that the Board knew of problems with Polycom's auditing and accounting controls or consciously disregarded its responsibilities. For instance, while the CW's statements suggest that Polycom employees (and some management) were aware of the problems with Miller's expense reports, the CW does not say that he ever informed Miller or any of the Board Mem-

bers of those issues. Nor do the CW's statements or Plaintiffs' pleadings connect the awareness of some employees and management at Polycom to what the Board should have known. Instead, Plaintiffs simply argue that red flags existed for the board to see "had they not turned a blind eye to their duties to ensure the Company had basic internal controls in place." Opp'n at 22–23. But Plaintiffs do not identify a single instance where internal controls were disregarded or red flags were ignored. Instead, Plaintiffs' complaint merely shows that some individuals within the company were aware of issues with Miller's expense reports, without providing any basis aside from speculation for determining the board knew or should have known that violations of the law were occurring. This is insufficient. *See In re MIPS Techs., Inc. Derivative Litig.*, No. C–06–06699, 2008 WL 3823726, at *6 (N.D.Cal. Aug. 13, 2008) (rejecting the statement that "members of [board committees] were very aware of what [a company Vice President] was doing ..." as "hopelessly vague [and] general") (internal quotation marks omitted) (emphasis omitted). Because a directors' duty to be informed does not "require directors to possess detailed information about all aspects of the operation of the enterprise," the Court cannot simply infer the board knew or should have known of the problems with Miller's expense reports. *Caremark*, 698 A.2d at 971.

As a result, the demand requirement cannot be excused for Plaintiffs' oversight claims.

### B. *False Financial Statement Claims*

■ Plaintiffs also allege that various public financial statements were materially false and misleading because (1) Miller submitted false expense reports, (2) those false reports caused Polycom to report false and misleading expenses and finan-cial results, (3) Miller violated Polycom's Code of Business Ethics and Conduct and therefore could have been dismissed, and (4) the company lacked effective internal controls. Plaintiffs argue that demand is excused on these claims because the board faces a substantial likelihood of liability for making these statements.

■ These allegations suffer from similar defects as Plaintiffs' oversight claims. Most importantly, Plaintiffs have again failed to adequately plead the Directors' state of mind. "[T]o show a substantial likelihood of liability" for false and misleading statements "that would excuse demand, plaintiffs must plead particularized factual allegations that 'support the inference that the disclosure violation was made in bad faith, knowingly or intentionally.'" *Citigroup*, 964 A.2d at 132 (quoting *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 915 (Del.Ch. Aug. 20, 1999)).

Here, Plaintiffs have not pleaded any particularized facts supporting a finding of bad faith, knowledge, or intent to deceive on the part of any of the Directors. In fact, Plaintiffs have not made any specific allegations about the Director Defendants' state of mind at all, which is necessary to determine whether any allegedly misleading statements were made with knowledge or bad faith. *Maxwell*, 2014 WL 2212155, at *12 ("Plaintiffs must allege specific factual allegations to allow a court to analyze the state of mind of individual director defendants, and cannot rely on broad group allegations.") (citing *Citigroup*, 964 A.2d at 134). Instead, Plaintiffs ask the Court to infer that because the Director Defendants and members of the Audit Committee had a duty to review Polycom's internal controls, auditing, and financial statements, and signed various statements averring that they did so, they either must have known of the falsity of aspects of those financial statements or turned a

blind eye to their duties. Other courts have rejected this theory, and the Court agrees. *See, e.g., Accuray,* 757 F.Supp.2d at 928; *Maxwell,* 2014 WL 2212155, at *11; *Wood v. Baum,* 953 A.2d 136, 142 (Del.2008); *Citigroup,* 964 A.2d at 126–27. Without any particularized allegations explaining what the Directors knew, when they knew it, or anything more than "general allegation[s] that the Board participated" in making or causing false or misleading statements to be made, the Court cannot infer that the board acted in bad faith, knowingly, or with intent to deceive. *Silicon Graphics,* 183 F.3d at 990 (finding that "claims rest[ing] on a general allegation that the Board participated in [a] fraudulent scheme" are insufficient standing alone); *see also Citigroup,* 964 A.2d at 132–34.

Finally, Plaintiffs allege that the Board caused Polycom to falsely or misleadingly suggest that the Company's investigation of Miller's expense reports was "complete," and failed to promptly inform the public that the SEC began an investigation into the Audit Committee's review of Miller's expenses and subsequent resignation. The allegedly false or misleading statement appeared in a Form 8–K filed with the SEC on July 23, 2013, and stated that "the Audit Committee of the Board completed a review of certain of Mr. Miller's expense submissions. The Audit Committee found certain irregularities in these submissions. At the conclusion of the review, Mr. Miller accepted responsibility" and resigned. Compl. ¶ 111. In Plaintiffs' view, this statement is false or misleading because it suggests that the inquiry into Miller's expenses was complete "when in fact such a review was ongoing and wouldn't be completed for many months...." Opp'n at 17–18. The problem with this view is that the statement says that the Audit Committee had completed a review of "*certain* of Mr. Miller's" expense reports—not that the Audit Com-

mittee had reviewed all of Miller's reports or that no further review of any other reports was ongoing. Similarly, Plaintiffs again fail to plead any facts about whether the Board acted in bad faith or with intent to deceive in using the word "completed" in reference to the Audit Committee's review or in failing to disclose the existence of the SEC investigation sooner.

As a result, the demand requirement cannot be excused for Plaintiffs' claims arising out of allegedly false or misleading statements.

## C. *Miller's Separation Agreement and Release*

█ Finally, Plaintiffs allege several issues related to the separation agreement between Polycom and Miller. First, Plaintiffs believe the separation agreement afforded Miller excessive benefits and constituted corporate waste. Second, Plaintiffs argue that the Board acted hastily, approving the separation agreement before determining the full scope and impact of Miller's improper expense submissions. Because Plaintiffs challenge "a discrete transaction," the Court reviews demand futility under the two-prong *Aronson* test. *Zucker v. Andreessen,* No. 6014–VCP, 2012 WL 2366448, at *6 (Del.Ch. June 21, 2012).

### 1. *First Prong of the Aronson Test*

While Plaintiffs largely confine their challenge to the separation agreement to the second prong of *Aronson,* Plaintiffs' complaint also alleges that the Board was not disinterested and independent in evaluating Miller's separation agreement. *See* Compl. ¶¶ 151–52 (arguing that the board did not act independently in negotiating and authorizing Miller's separation from Polycom). Defendants challenge these allegations, and Plaintiffs appear to have abandoned this theory, instead arguing

that the separation agreement is not protected by the business judgment rule.

 Nevertheless, in the interest of completeness, the Court finds that Plaintiffs have failed to raise a reasonable doubt as to the Board's independence. Directors are independent when their decisions are "based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816. "When alleging lack of independence in the demand futility context, 'a plaintiff charging domination and control of one or more directors must allege particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the [person] doing the controlling.'" *Bidz.com*, 773 F.Supp.2d at 853 (quoting *Aronson*, 473 A.2d at 816).

Here it strains credulity to conclude that the Board was simultaneously so beholden to Miller that it could not independently negotiate his departure from the company and sufficiently independent to initiate an internal investigation, confirm Miller's wrongdoing, and obtain his departure from the Company. *Id.* at ¶ 152. Another court has found that similar allegations of a lack of independence were unavailing under circumstances like these, and the Court concurs. *Andropolis v. Snyder*, No. 05 CV 01563 EWN BNB, 2006 WL 2226189, at *9 (D.Colo. Aug. 3, 2006) ("It is difficult to conceive that a majority of the Board was so 'beholden' to Defendant [Miller], yet they were able to initiate an internal investigation and force Defendant [Miller's] [departure].").

### 2. *Second Prong of the Aronson Test*

 To show demand futility under *Aronson's* second prong, Plaintiffs must plead particularized facts raising a reasonable doubt that the transaction is protected by the business judgment rule. The business judgment rule is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *Aronson*, 473 A.2d at 812. To rebut this presumption, "plaintiffs must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision." *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 286 (Del.Ch.2003).

 Plaintiffs argue they have raised a reasonable doubt as to whether the approval of the separation agreement was a valid exercise of business judgment because the agreement constituted corporate waste. Waste requires a "showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests." *White v. Panic*, 783 A.2d 543, 554 n. 36 (Del.2001). "Where ... the corporation has received 'any substantial consideration' and where the board has made 'a good faith judgment that in the circumstances the transaction was worthwhile' a finding of waste is inappropriate, even if hindsight proves that the transaction may have been ill-advised." *Protas v. Cavanagh*, No. 6555–VCG, 2012 WL 1580969, at *9 (Del.Ch. Mar. 30, 2012) (quoting *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del.Ch.1997)).

Plaintiffs cannot satisfy this test for two reasons. First, Polycom received substantial consideration under the agreement. Under the terms of the agreement, Miller received $500,000 cash, continued bonus eligibility for the first half of 2013 (the agreement was entered into on July 22, 2013 and his bonus eventually amounted to $320,625), reimbursement for COBRA expenses, and was allowed to keep his company computer and other mobile electronic

equipment. Miller also continued to receive his base salary through August 15, 2013, and was able to collect previously unvested stock awards. In exchange for those benefits to Miller, Polycom received a release of Miller's employment-related claims, an agreement to assist Polycom during its leadership transition, Miller's voluntary resignation from the board (without requiring a shareholder vote), and various other contractual protections like non-disparagement and anti-solicitation provisions. As another court recently found while assessing a similar separation agreement, these provisions "clearly provide benefits to [Polycom]." *Maxwell*, 2014 WL 2212155, at *16.

Second, because "Plaintiffs do not raise any reasonable doubt that this decision fell outside the outer limits of the Board's broad discretion to determine how to compensate [Miller]," the question of whether the benefits to Polycom justify the costs in benefits to Miller remains "a business decision for the Board." *Id.* Two points support this conclusion. First, Defendants note that while the separation agreement may, in isolation, appear to confer excessive benefits on Miller, Plaintiffs ignore that Miller was already entitled to compensation by virtue of his preexisting contractual relationship with Polycom and do not allege that he received more than he would have received had the Board terminated him for cause. Second, and even more importantly, as the Board Members repeatedly point out, the separation agreement does not release Polycom's potential claims against Miller. As a result, the separation agreement protected Polycom from potential future litigation by Miller, while still preserving the Board's prerogative to bring suit against Miller if the Board later discovered grounds for doing so.

Nevertheless, Plaintiffs argue that even if there is no reason to doubt the

Board's honesty and good faith, the Board is still not entitled to business judgment protection because it was not adequately informed prior to entering into the separation agreement. In support of these arguments, Plaintiffs relies on *In re Walt Disney Co. Derivative Litigation*, 825 A.2d 275 (Del.Ch.2003), which they argue demonstrates the Board's bad faith and failure to exercise its business judgment "on facts similar to, but even less damaging than this case." Opp'n at 18. In *Disney*, the court found that the plaintiffs' allegations demonstrated that Disney's directors failed to exercise "*any* business judgment and failed to make *any* good faith attempt to fulfill their fiduciary duties" because the board abdicated all responsibility regarding an executive's termination agreement. 825 A.2d at 278 (emphasis in original). Specifically, the *Disney* board "(1) failed to ask why it had not been informed; (2) failed to inquire about the conditions and terms of the agreement; and (3) failed even to attempt to stop or delay the termination until more information could be collected." *Id.* at 289. Nonetheless, the *Disney* court recognized that "[i]f the board had taken the time or effort to review these or other options, perhaps with the assistance of expert legal advisors, the business judgment rule might well protect its decision." *Id.*

Defendants rightly argue that was the case here. Unlike the board's "ostrich-like approach" in *Disney*, the Board here did not abdicate its responsibilities to be informed entirely or allow conflicts of interest to infect the process. On the contrary, the Board was aware of the issues with Miller's expense reports at the time it entered into the separation agreement, had conducted an internal investigation into certain of Miller's expense reports, and was represented by independent legal

counsel in an arms-length negotiation. Furthermore, Plaintiffs do not allege that the Board did not understand the terms of Miller's separation agreement. Plaintiffs' only complaint is that the Board did not gather more information before acting. But "[t]he business judgment rule ... only requires the board to *reasonably* inform itself; it does not require perfection or the consideration of every conceivable alternative." *In re Goldman Sachs Grp. Inc. S'holder Litig.*, Civ. A. No. 5215–VCG, 2011 WL 4826104, at *16 (Del.Ch. Oct. 12, 2011) (emphasis in original). The Court is persuaded under these circumstances the Board was reasonably informed at the time the separation agreement was negotiated and approved, and as a result their actions are protected by the business judgment rule.

As a result, the demand requirement cannot be excused for Plaintiffs' claims arising out of the separation agreement.

### D. *Demand Futility as to the Audit Committee*

 Finally, Plaintiffs argue that even if they have inadequately pleaded demand futility to Atkins and Owens, the Court should still find demand futile because the members of the Audit Committee, Kelley, Mercer, and Parker, faced a substantial likelihood of liability for inadequate oversight and for the allegedly false and misleading financial statements. Plaintiffs' chief support for this argument is the charter for Polycom's Audit Committee, which lays out the Committee's responsibilities, and various reports and financial statements in which the Audit Committee members reiterated their duties to review Polycom's "internal controls processes, audit processes, and financial statements," and acknowledged that they had done so. Opp'n at 23; Compl. ¶¶ 145–50. Because the Audit Committee was responsible for and repeatedly averred that it had reviewed Polycom's internal controls, audit-

ing, and finances, Plaintiffs conclude the Audit Committee "expressly acknowledged having contemporaneous and direct access to specific, material facts that contradicted and demonstrated the misleading nature of the ... challenged statements, and to facts demonstrating Polycom's inadequate internal controls." Compl. ¶ 146; Opp'n at 23.

The problem with this argument is that it is "contrary to well-settled Delaware law" to infer a culpable state of mind based solely on membership on the Audit Committee. *Wood*, 953 A.2d at 142. So, for example, in *Rattner v. Bidzos*, No. Civ.A. 19700, 2003 WL 22284323 (Del.Ch. Apr. 7, 2003), Vice Chancellor Noble addressed a similar demand futility theory specifically targeting the members of a corporation's audit committee. In *Rattner*, as here, the complaint "sets forth vast tracts of quoted materials from public sources detailing wrongdoing in the form of alleged misstatements" and alleged a failure of oversight in ignoring a red flag. But, as the Court found, these allegations were insufficient to plead demand futility as to audit committee members because plaintiffs failed to plead "any ... particularized facts regarding ... the actions and practices of [the company's] audit committee." *Id.* at *12–13. Instead, "[t]he only information one can snare from the Amended Complaint is that there exists a body of rules regarding the accuracy of recording and reporting financial information which may have been violated." *Id.* at *13. As a result, "[t]he most I can safely admit knowledge of is that [Kelley], [Mercer], and [Parker] were members of the Audit Committee during the Relevant Period and, thus, that [Polycom] had an Audit Committee." *Id.*

Stripping away Plaintiffs' conclusory and rhetorical use of phrases like "blind eye," "consciously or recklessly," and "knew or recklessly disregarded," it is clear that

Plaintiffs' sole basis for determining the Audit Committee's state of mind is the access to information their position on the Audit Committee conferred. That sharply distinguishes this case from the three cases on which Plaintiffs rely in support of this argument. For example, in *In re Veeco Instruments, Inc. Securities Litigation*, 434 F.Supp.2d 267 (S.D.N.Y.2006), plaintiffs' complaint detailed the company and, specifically, the audit committee's failure over 27 separate meetings to respond to two whistleblower reports, an internal audit that found multiple violations of law, and reduction of its accounting staff to only two people. *Id.* at 277–78. Unlike *Veeco*, the Complaint here includes no allegations that the Polycom was aware (or informed by the CW or other whistleblower) of Miller's violations of the expense reimbursement policy, failed to heed those warnings, reduced or eliminated internal auditing or controls, or that the Audit Committee repeatedly ignored those issues. Instead, as in another case rejecting a similar theory, there is no allegation the issues with Miller's expense reports were brought to the Audit Committee's attention, and the fact that they "should have examined the financial statements does not establish that they should have known there were problems in the documents." *Maxwell*, 2014 WL 2212155, at *14.

As a result, the demand requirement cannot be excused based on potential liability for the Audit Committee.

### E. *Does the Weight of the Evidence Raise a Reasonable Doubt as to the Board's Impartiality?*

Having assessed each of Plaintiffs' allegations standing alone, Delaware law requires the Court to determine "whether the totality of Plaintiffs' allegations demonstrates a reasonable doubt about the Board's impartiality." *Bidz.com*, 773 F.Supp.2d at 861. The Court finds that Plaintiffs' allegations, whether considered standing alone or in their totality, do not demonstrate that demand would have been futile.

## V. CONCLUSION

For the reasons set forth above, Plaintiffs have failed to allege demand futility with particularity. Accordingly, the motion to dismiss is GRANTED. Defendants also moved in the alternative dismiss for failure to state a claim under Rule 12(b)(6). Because the Court grants dismissal on other grounds, that motion is DENIED without prejudice as moot. Nevertheless, the Court is mindful of the Ninth Circuit's liberal policy favoring granting leave to amend. As a result, the dismissal is without prejudice and the Court GRANTS leave to amend within thirty (30) days of the signature date of this order to address the issues identified above.

IT IS SO ORDERED.