**COURT OF CHANCERY**
OF THE
**STATE OF DELAWARE**

TAMIKA R. MONTGOMERY-REEVES
VICE CHANCELLOR

New Castle County Courthouse
500 N. King Street, Suite 11400
Wilmington, Delaware 19801-3734

Date Submitted: April 18, 2017
Date Decided: June 16, 2017

Blake A. Bennett, Esquire
Cooch and Taylor, P.A.
1000 West Street, 10th Floor
Wilmington, DE 19899

Peter J. Walsh, Jr., Esquire
Andrew H. Sauder, Esquire
Potter Anderson & Corroon LLP
1313 North Market Street, 6th Floor
Wilmington, DE 19801

RE: *In re Qualcomm Inc. FCPA Stockholder Derivative Litigation*,
C.A. No. 11152-VCMR

Dear Counsel:

This letter resolves Defendants' motion to dismiss Plaintiffs' Verified Amended Stockholder Derivative Complaint (the "Complaint"). The Complaint alleges that the Qualcomm Inc. ("Qualcomm") board's conscious disregard for red flags resulted in violations of the Foreign Corrupt Practices Act ("FCPA") and a March 2016 U.S. Securities and Exchange Commission ("SEC") cease-and-desist order. Plaintiffs' Complaint asserts claims for breach of fiduciary duty, waste, and unjust enrichment against the Qualcomm directors and former Chief Financial Officer. Defendants moved to dismiss under Court of Chancery Rule 23.1 for failure to make demand or allege demand futility and Rule 12(b)(6) for failure to state a

claim. For the reasons stated herein, I grant Defendants' Rule 23.1 motion to dismiss all counts in Plaintiffs' Complaint.

## I.  BACKGROUND

The facts in this opinion derive from the Complaint, the documents attached to it, and the documents incorporated by reference into the Complaint.[1]

### A.  The Foreign Corrupt Practices Act

On March 1, 2016, the SEC determined that between 2002 and 2012, Qualcomm violated the FCPA. The FCPA is a federal anti-bribery statute that forbids illicit payments to foreign government officials to obtain or retain business overseas.[2] It also requires that publicly traded companies like Qualcomm establish adequate internal controls to ensure (1) that they execute only authorized transactions and (2) that all company transactions are accurately recorded. The FCPA further requires that publicly traded companies actually make and keep accurate accounting records for all transactions and dispositions of company assets.[3]

---

[1] *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 659 n.3 (Del. Ch. 2013) ("To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents." (quoting *DeLuca v. AccessIT Gp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010)) (internal quotation marks omitted)).

[2] Compl. ¶ 4.

[3] *Id.* ¶ 65.

B.     The Red Flags

Plaintiffs allege that the Qualcomm board pursued a business expansion plan emphasizing the Asia Pacific region, particularly China, which resulted in FCPA violations. According to the Complaint, China is a country of focus for U.S. FCPA regulators because of the large number of state-owned enterprises and the culture of gift giving.[4] As such, Plaintiffs assert that U.S. companies doing business in China are on notice of the importance of FCPA compliance.[5]

The Complaint alleges that the Qualcomm board and its Audit Committee knew of several red flags regarding FCPA compliance in China and Korea. On April 20, 2009, the Qualcomm Audit Committee was presented with an Internal Audit Update, which showed that certain gifts were not being appropriately logged on the Qualcomm gift logs. At the Audit Committee's July 20, 2009 meeting, committee members received reports of potential FCPA violations. And in December 2009, the Audit Committee learned of whistleblower allegations of FCPA violations. In addition, a presentation given at the January 25, 2010 Audit Committee meeting shows that "[a] large number of activities such as business meals, business

---

[4]     *Id.* ¶¶ 71-72.

[5]     *Id.* ¶ 75.

entertainment, marketing and gifts with known government related entities have not been recorded in the Qualcomm China Gift logs."[6]  A similar problem was presented with respect to Korean gift logs at the same meeting.  Finally, for the audit period from January 1, 2010 through March 31, 2011, the Complaint alleges that PricewaterhouseCoopers noted that "QCA" did not have certain FCPA compliance processes in place.[7]  Defendants assert that QCA is a company that Qualcomm had recently acquired, but the Complaint does not allege what QCA is.

## C.    The SEC Cease-and-Desist Order

On March 1, 2016, the SEC determined that cease-and-desist proceedings should be instituted against Qualcomm as a result of alleged FCPA violations.  In anticipation of the institution of cease-and-desist proceedings, Qualcomm reached a settlement with the SEC, which was announced simultaneously with the cease-and-desist proceedings.  The SEC released the terms of the settlement in the form of a cease-and-desist order.[8]

---

[6]    Skaistis Aff. Ex. 9.

[7]    Compl. ¶¶ 79-84, 92.

[8]    *Id.* Ex. A.

The cease-and-desist order shows that the SEC found that Qualcomm violated the FCPA in the following ways: (1) from 2002 until 2012, Qualcomm provided frequent meals, gifts, and entertainment to Chinese officials who were considering whether to adopt Qualcomm technology; (2) Qualcomm hired relatives of Chinese officials, including a Chinese executive's son that Qualcomm's human resources department originally determined was not "a skills match" and should not be hired; (3) Qualcomm's books and records did not fairly and accurately account for the illegal gifts but rather recorded them as generic marketing or sales expenses; and (4) Qualcomm lacked adequate internal controls to provide reasonable assurances that only authorized transactions were executed and that all transactions were accurately recorded. The order required that Qualcomm pay a penalty of $7.5 million and make periodic reports to the SEC for two years.

## II.    ANALYSIS

### A.    Standard for Demand Futility

Stockholders bringing derivative claims must satisfy the demand requirement in Court of Chancery Rule 23.1 by either making demand on the board of directors or alleging that demand would be futile. In cases challenging board inaction, Delaware courts analyze demand futility under the test established in *Rales v.*

*Blasband.*[9]  Under *Rales*, "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[10]  A plaintiff may satisfy the *Rales* test for demand futility by demonstrating that a disabling interest excusing demand exists because the complaint's underlying claims pose a substantial threat of liability to a majority of the board.[11]  "Demand is not excused solely because the directors would be deciding to sue themselves."[12]  Rather, to excuse demand, the alleged derivative claims against the board must be sufficiently strong such that a majority of the members of the board face a "substantial likelihood" of personal liability.[13]  "The analysis of

---

[9]  *Melbourne Mun. Firefighters' Pension Trust Fund v. Jacobs*, 2016 WL 4076369, at *6 (Del. Ch. Aug. 1, 2016).

[10]  *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).

[11]  *Melbourne*, 2016 WL 4076369, at *6.

[12]  *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009).

[13]  *Melbourne*, 2016 WL 4076369, at *6.

whether a majority of the board faces a substantial likelihood of personal liability 'is conducted on a claim-by-claim basis.'"[14]

## B. The Complaint Fails to Allege Demand Futility as to Count I

Count I of the Complaint alleges a breach of fiduciary duty claim for improper oversight, also known as a *Caremark* claim. The Delaware Supreme Court in *Stone v. Ritter* reiterated the two bases on which directors may be held liable on a *Caremark* claim as: "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[15] Where, as here, plaintiffs rely on the second basis for a *Caremark* claim, a complaint must allege "(1) that the directors knew or should have known that the corporation was violating the law, (2) that the directors acted in bad faith by failing to prevent or remedy those violations, and (3) that such failure resulted in damage to the corporation."[16]

---

[14]     *Id.* (quoting *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 58 n.71 (Del. Ch. 2015)).

[15]     *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[16]     *Melbourne*, 2016 WL 4076369, at *8.

Plaintiffs generally "attempt to satisfy the elements of a *Caremark* claim by pleading that the board had knowledge of certain 'red flags' indicating corporate misconduct and acted in bad faith by consciously disregarding its duty to address that misconduct."[17] Additionally, a plaintiff may adequately plead bad faith by alleging that the board intentionally directed the corporation to violate the law. "Under Delaware law, a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity."[18] "Delaware law does not charter law breakers," and "a fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law."[19]

Here, Plaintiffs do not argue that the Qualcomm board intentionally caused Qualcomm to violate the law. As such, to adequately plead bad faith, "Plaintiff[s] must plead particularized facts from which it is reasonably inferable that the [b]oard consciously disregarded its duties by 'intentionally fail[ing] to act in the face of a

---

[17]   *Id.*

[18]   *Id.* at *9 (quoting *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004)).

[19]   *Id.* (quoting *In re Massey Energy Co.*, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011)).

known duty to act.'"[20]  "Conscious disregard involves an intentional dereliction of duty which is more culpable than simple inattention or failure to be informed of all facts material to the decision."[21]  Further, "[s]imply alleging that a board incorrectly exercised its business judgment and made a 'wrong' decision in response to red flags . . . is insufficient to plead bad faith."[22]

The Complaint in this case fails to allege particularized facts giving rise to an inference that a majority of the board faces a substantial likelihood of liability on the *Caremark* claim alleged.  As in *Melbourne*, I need not address whether the alleged red flags actually constitute red flags or whether the board's response to the alleged red flags caused damage to Qualcomm because the Complaint fails to plead facts giving rise to an inference that the board acted in bad faith.

Assuming for purposes of this analysis that the various reports to the Audit Committee and the board constituted red flags, the Complaint does not allege that the board consciously disregarded the red flags.  Many of the documents the

---

[20]    *Id.* (quoting *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006)).

[21]    *Id.* (quoting *In re Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, at *13 (Del. Ch. Oct. 12, 2011)).

[22]    *Id.* (citing *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 131 (Del. Ch. 2009)).

Complaint cites as red flags also include planned remedial actions. For example, Plaintiffs cite the April 20, 2009 presentation to the Audit Committee, which states that "2 of the FCPA related events tested were not recorded on the gift log of the respective office."[23] But the next line on that page provides recommendations to address the issue. It states that "the listing of departments and individuals that receive the annual FCPA certification should be formally reviewed on an annual basis" and the Senior Vice President of Government Affairs "should re-iterate to all employees assigned to the Government Affairs department the requirement to record all FCPA related activities in the gift log."[24] Further, Plaintiffs cite a January 25, 2010 Audit Committee presentation where the committee was informed that "[a] large number of activities such as business meals, business entertainment, marketing and gifts with known government related entities have not been recorded in the Qualcomm China Gift logs."[25] But the same page states corrective actions that the company will take, including that the Executive Vice President for the Asia Pacific, the Middle East, and Africa "will hold an all-hands meeting with the employees of

---

[23]    Skaistis Aff. Ex. 10.

[24]    *Id.*

[25]    *Id.* Ex. 9.

QC China to explain the approval, expense tracking and record keeping requirements of the Corporate FCPA policy and to emphasize the significance of employee compliance."[26] It also states that "[k]ey individuals, which meet with government officials, should be required to submit the completed FCPA log with their expense report for reimbursement. The QC China Director of Finance should review these expense reports to verify the accuracy and completeness of the Gift logs."[27]

These responses to the red flags show that the board did not act in bad faith. There is no indication that the board believed Qualcomm could continue to violate the FCPA without consequences. And no allegations suggest that the Qualcomm board consciously disregarded the red flags. The allegations in the Complaint do not adequately plead "an intentional dereliction of duty"[28] after the board was aware of the risk of future FCPA violations through the red flags. In fact, Plaintiffs point to only two factual allegations as evidence of a failure to respond to the red flags: a December 31, 2013 target date for the translation of its FCPA compliance materials

---

[26]    *Id.*

[27]    *Id.*

[28]    *Melbourne*, 2016 WL 4076369, at *9.

into Chinese[29] (which Plaintiffs allege was too late) and the company's plan to formulate a long-range FCPA plan[30] (which Plaintiffs again contend was too late because it remained outstanding as of January 27, 2014). These board decisions do not rise to the level of bad faith. Instead, Plaintiffs here simply seek to second-guess the timing and manner of the board's response to the red flags, which fails to state a *Caremark* claim.

Further, contrary to Plaintiffs' assertions, this case is distinguishable from *In re Massey Energy Co.*,[31] *Louisiana Municipal Police Employees' Retirement System v. Pyott (Allergan I)*,[32] and *Westmoreland County Employee Retirement System v. Parkinson (Baxter)*.[33] In *Baxter*, the board of directors stopped spending on remedial measures that the FDA had ordered under a consent order. Instead, the board publicly announced that it was focusing on a new product.[34] The court in *Baxter*

---

[29]     Compl. ¶ 85.

[30]     *Id.* ¶ 86.

[31]     2011 WL 2176479 (Del. Ch. May 31, 2011).

[32]     46 A.3d 313 (Del. Ch. 2012), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013).

[33]     727 F.3d 719 (7th Cir. 2013) (applying Delaware substantive law).

[34]     *Baxter*, 727 F.3d at 723.

inferred that the board believed that it did not need to follow the orders of the FDA if it could develop a new product before the FDA realized that the company had stopped attempting to remedy defects in its older product.[35] Similarly, this Court has previously distinguished *Massey* because "[t]he company's CEO in *Massey* 'believ[ed] he knew better about how to run mines safely than the' government agency charged with regulating mine safety and 'publicly stated that the idea that governmental safety regulators knew more about mine safety than he did was silly.'"[36] The Qualcomm board, in contrast, recognized the FCPA compliance issues and reacted with corrective measures in the face of the alleged red flags. As this Court explained in *Melbourne*, *Allergan I* also is distinguishable because "the board's alleged bad faith in [*Allergan I*] was not based on its conscious disregard for its duty to *prevent* the company from engaging in illegal conduct. Instead, it was based on the board's alleged decision to *cause* the company to engage in illegal conduct."[37] The Complaint in this case, unlike *Allergan I*, does not allege a board decision to cause Qualcomm to violate the FCPA.

---

[35]   *Id.* at 729.

[36]   *Melbourne*, 2016 WL 4076369, at *10 (quoting *In re Massey Energy Co.*, 2011 WL 2176479, at *18-19 (Del. Ch. May 31, 2011)).

[37]   *Id.* at *12.

Plaintiffs also argue that the FCPA establishes a statutory floor for adequate internal controls, and because the Qualcomm cease-and-desist order describes internal control violations of the FCPA, the Complaint necessarily states a claim.[38] But that argument is misplaced here. A corporation's violation of the FCPA alone is not enough for director liability under *Caremark*. "Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so."[39] Delaware law, not the FCPA, establishes the standard for director liability, and under Delaware law, Plaintiffs' Complaint does not allege bad faith.

Finally, Plaintiffs argue in their answering brief that Qualcomm failed to establish an effective FCPA compliance program from 2002 through 2009 while the company violated the FCPA. But the Complaint does not allege those facts, and the documents from 2004 and 2006 on which Plaintiffs rely were not attached to or incorporated into the Complaint. Further, even if Plaintiffs had challenged pre-2009 conduct in the Complaint, they do not explain why that claim would not be barred by laches. Thus, Defendants' Rule 23.1 motion to dismiss count I is granted.

---

[38]    Pl.'s Answering Br. 26.

[39]    *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007).

## C. The Complaint Fails to Allege Demand Futility as to Count II

Count II alleges a claim for waste against the individual Defendants. Plaintiffs challenge the illegal bribes that Qualcomm paid in Asia and the compensation that Qualcomm paid its directors and officers while the corporation violated the FCPA.

> To recover on a claim of corporate waste, the plaintiffs must shoulder the burden of proving that the exchange was "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." A claim of waste will arise only in the rare, "unconscionable case where directors irrationally squander or give away corporate assets."[40]

The board does not face a substantial likelihood of liability on count II because the Complaint does not allege that the board directed Qualcomm to enter any wasteful transaction. As to the illegal bribes, nothing in the Complaint suggests that the board authorized those payments such that the directors would face a substantial likelihood of liability on a claim for waste. The corporation may very well have a claim against the employees who provided unauthorized gifts to foreign officials, but absent any particularized allegations tying the bribery to the board, the directors are competent to decide whether Qualcomm should pursue that claim.

---

[40] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2006) (quoting *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000)).

As to the waste claim for the compensation of Qualcomm's directors and officers, the Complaint does not allege that Qualcomm paid any compensation in exchange for inadequate consideration. The Qualcomm directors or officers did not fail to perform any services for which they were paid. Thus, Plaintiffs' Complaint does not contain particularized facts giving rise to the inference that the board is not competent to decide whether to bring the claim alleged in count II. Count II is dismissed.

### D. The Complaint Fails to Allege Demand Futility as to Count III

Count III alleges a claim for unjust enrichment against the individual Defendants because the Qualcomm financial results were inflated as a result of the company's FCPA violations, and the individual Defendants' incentive compensation was based on the financial results. The Complaint, however, alleges no basis for that conclusory statement. It does not allege how the financial results were inflated or that the financial statements have been restated. Count III, as alleged, does not pose a substantial likelihood of director liability and is dismissed.

## III.    CONCLUSION

For the reasons stated herein, Defendants' motion to dismiss under Court of

Chancery Rule 23.1 is granted.

**IT IS SO ORDERED.**

Sincerely,

*/s/ Tamika R. Montgomery-Reeves*

Vice Chancellor